IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | CASE NO. 14-cv-1292-JPG-SCW |
| v. | ) ) | C O M P L A I N T |
| AMSTED INDUS. INC. AND AMSTED RAIL CO., INC., | ) ) ) | JURY TRIAL DEMAND |
| Defendant. | ) ) ) | |

NATURE OF THE ACTION

This is an action under Titles I and V of the Americans with Disabilities Act of 1990 and Title I of the Civil Rights Act of 1991 to correct unlawful employment practices on the basis of disability and to provide appropriate relief to Montrell Ingram and a class of job applicants who were denied employment opportunities because Amsted Industries Inc. and Amsted Rail Co., Inc., regarded them as disabled and / or because they had a record of a disability, carpal tunnel syndrome. The Commission alleges that Amsted Industries and Amsted Rail Co. violated the Americans with Disabilities Act (ADA) when they refused to hire Montrell Ingram and a class of qualified applicants for employment as chippers because of disability.

JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345.  This action is authorized and instituted pursuant to Section 107(a) of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12117(a), which incorporates by reference Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e-5(f)(1) and (3) and § 2000e-6, and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2.      The employment practices alleged to be unlawful were and are now being committed within the jurisdiction of the United States District Court for the Southern District of Illinois.

<u>PARTIES</u>

3.      Plaintiff, the Equal Employment Opportunity Commission (the "Commission"), is the agency of the United States of America charged with the administration, interpretation and enforcement of Titles I and V of the ADA and is expressly authorized to bring this action by Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1) and (3).

4.      At all relevant times, Defendants (the "Employers") have continuously been Delaware corporations doing business in the State of Illinois and the City of Granite City and have continuously had over 500 employees.

5.      At all relevant times, Defendant Employers have continuously been an employer engaged in an industry affecting commerce under Section 101(5) of the ADA, 42 U.S.C. § 12111(5), and Section 101(7) of the ADA, 42 U.S.C. § 12111(7), which incorporates by reference Sections 701(g) and (h) of Title VII, 42 U.S.C. §§ 2000e(g) and (h).

6.      At all relevant times, Defendant Employers have been covered entities under Section 101(2) of the ADA, 42 U.S.C. § 12111(2).

7.      Defendant Amsted Rail Co., Inc. is a subsidiary of Defendant Amsted Industries Inc. Upon information and belief, Defendant Employers operate as an integrated enterprise or a single employer.

<u>STATEMENT OF CLAIMS</u>

8.     More than thirty days prior to the institution of this lawsuit, Montrell Ingram filed a charge with the Commission alleging violations of Titles I and V of the ADA by Defendant Employers.

9.     On February 28, 2013, the EEOC found reasonable cause to believe that Defendant Employers discriminated against Ingram and a class of similarly aggrieved job applicants in violation of the ADA.

10.     The conciliation efforts required by law have occurred and were unsuccessful.

   a.     On February 28, 2013, the EEOC issued to Defendant Employers a Letter of Determination inviting it to join with the EEOC in informal methods of conciliation to endeavor to eliminate the discriminatory practices and provide appropriate relief.

   b.     On February 12, 2014, the EEOC issued to counsel for Defendant Employers a Notice of Failure of Conciliation advising it that despite its efforts the EEOC was unable to secure a conciliation agreement acceptable to the Commission.

11.     All conditions precedent to the institution of this lawsuit have been fulfilled.

12.     Since at least September 1, 2009, until October 4, 2010, Defendant Employers engaged in unlawful employment practices at their Granite City facility, in violation of Sections 102(b)(1) and (b)(5)(A) of Title I of the ADA, 42 U.S.C. §§ 12112(b)(1) and (b)(5)(A), and Section 503(a) of Title V of the ADA, 42 U.S.C. § 12203(a) as follows:

**Defendant Employers' medical evaluations of applicants for chipper positions.**

   a.  Defendant Employers employ individuals in the position of chipper at their Granite City, Illinois facility.

b.  A chipper uses a chipping hammer or grinder to remove metal protrusions from steel castings.

c.  Defendant Employers require applicants for the position of chipper to undergo a medical evaluation as part of the application process.

d.  The medical examination consists of the completion of a medical questionnaire, taking of the applicant's vital signs, and administration of a nerve conduction test and physical agility tests.

e.  Midwest Occupational Medicine is under contract with Defendant Employers to perform medical evaluations of applicants for the chipper position.  Dr. George Dirker owns Midwest Occupational Medicine and is board certified in internal medicine.

f.  Dr. Dirker states that in his private practice about two percent of his patients have experienced symptoms of carpal tunnel syndrome and that he refers those patients to a specialist rather than making a diagnosis himself.

g.  Applicant nerve conduction tests are usually administered by an assistant or technician and not by Dr. Dirker.  Dr. Dirker relied on the nerve conduction test results without any further inquiry or examination of applicants before making a decision about their qualifications for hire.

h.  Defendant Employers own the nerve conduction testing equipment, called the Advance NCS/EMG System, which is used to perform nerve conduction tests during the hiring process.

i.   The nerve conduction test results used by Defendant Employers and Midwest Occupational Medicine during the hiring process do not reliably predict applicants' likelihood of developing carpal tunnel syndrome.

j.   Defendant Employers did not rely on the most current medical knowledge in using only nerve conduction tests and / or applicants' prior record of carpal tunnel syndrome in concluding that particular applicants were unqualified for chipper positions.

k.   The most current relevant published medical literature does not support the use of nerve conduction test results alone nor the use of prior history alone to predict the development of carpal tunnel syndrome. Such tests are considered largely ineffective at predicting a person's current ability to perform the essential functions of a position which requires repetitive hand motion such as the chipper position. Prior history alone is also considered largely ineffective at predicting a person's current ability to perform the essential functions of a position which requires repetitive hand motion such as the chipper position.

l.   Nerve conduction tests do not assess an individual's current ability to perform the chipper job nor are the test results alone predictive of the likelihood that an individual will develop carpal tunnel syndrome at a later date.

m.  Defendant Employers' medical evaluations for the chipper position are not an individualized assessment of applicants' present ability to safely perform the essential functions of the chipper position and are not based on the most current medical knowledge and/or the best available objective evidence.

**Defendant Employers refused to hire Montrell Ingram based on their medical evaluation in violation of the Americans with Disabilities Act ("ADA").**

n.  In 2005, Montrell Ingram was diagnosed with carpal tunnel syndrome, a neurological impairment that substantially limited his manual dexterity, and he underwent a surgical repair of both wrists. As a result of the surgery, Ingram's symptoms were eliminated, and he was cleared by his doctor to return to manual work. Ingram has been free of symptoms since the surgery and in the last nine years has held several jobs requiring manual work and repetitive tasks with no recurrence of carpal tunnel syndrome.

o.  In 2011, Montrell Ingram applied for the position of chipper at Defendant Employers' facility in Granite City, Illinois.  Ingram was fully qualified for the position.

p.  Defendant Employers offered Ingram employment as a chipper conditioned upon his passing a medical evaluation.

q.  As part of the medical evaluation, Ingram completed an extensive questionnaire about his medical history in which he disclosed his previous surgery for carpal tunnel syndrome on both wrists.

r.  Defendant Employers administered a nerve conduction test and Ingram passed the test.

s.  Dr. George Dirker was retained by Defendant Employers to conduct the medical evaluation of Montrell Ingram.

t.  Dirker determined that based on Ingram's history of carpal tunnel syndrome he was "at substantial risk for further injury to himself if he performed the essential functions of the chipper position."

u.  Dirker admits that Ingram would have been able to perform the essential functions of the chipper position at the time of the nerve conduction test and that he did not conduct an individualized assessment to determine whether Ingram would have posed a direct threat of harm to himself if employed in a chipper position.

v.  Upon learning of Ingram's history of carpal tunnel syndrome, despite the fact that Ingram passed the nerve conduction test, Dirker determined that Ingram was not medically qualified for the chipper job and placed him on "medical hold pending availability of other suitable positions."

w.  Dirker did not tell Ingram that his application was on hold; rather he simply told Ingram that Defendant Employers do not hire applicants with a history of carpal tunnel syndrome.

x.  Dirker told Ingram that "we [Defendant Employers] don't hire persons that have had carpal tunnel before." Defendant Employers then refused to hire Ingram based on his record of carpal tunnel syndrome.

**Defendant Employers refused to hire a class of job applicants based on its medical evaluations in violation of the ADA.**

y.  Defendant Employers refused to hire at least fifty other applicants for the chipper position based on the results of their nerve conduction tests and / or a prior history of carpal tunnel syndrome.

z.  Most of these applicants were told by Defendant Employers' representatives either that they had carpal tunnel syndrome or would likely develop carpal tunnel syndrome in the future.

aa. Some applicants were told they would not be hired because of the test results with no additional explanation. Many of the applicants were told that they could obtain

7

a second medical opinion and undergo additional nerve conduction testing at their own expense and then be reconsidered for hire by Defendant Employers.

bb. At least seventeen applicants chose to obtain a second medical opinion and/or undergo additional nerve conduction tests. Every one of these seventeen applicants returned to Defendant Employers with additional medical information which showed no evidence of carpal tunnel syndrome, but Defendant Employers refused to hire any of those applicants.

cc. Defendant Employers refused to hire the aggrieved applicants solely because of the results of their nerve conduction tests or because they had a record of carpal tunnel syndrome.

dd. Defendant Employers determined that the aggrieved applicants were "medically unqualified" to perform the essential functions of the chipper job.

ee. Defendant Employers regarded the aggrieved applicants as disabled even though none of them had carpal tunnel syndrome at the time they applied to work as chippers.

ff. Defendant Employers violated the ADA when it refused to hire Ingram and the aggrieved applicants because of the results of their nerve conduction test results and / or their record of carpal tunnel syndrome.

**Examples of aggrieved applicants.**

gg. Robert Blaylock worked as a barber before applying for a chipper job. Dirker claims that working as a barber is likely to cause carpal tunnel syndrome. Blaylock never had any symptoms of carpal tunnel syndrome.

hh. Dirker told Blaylock he could not be hired because of the results of his nerve conduction test but that he could get a second opinion.  Blaylock went to a hospital on the same day and was examined by a physician who told him he did not have carpal tunnel syndrome.

ii.  When Blaylock returned to Defendant Employers, he was told that the physician's opinion was not sufficient and that he would have to undergo an expensive nerve conduction test performed by a specialist.  Blaylock could not afford the test and Defendant Employers refused to hire him.

jj.  Before applying for a chipper job, Terrance Buckley had a long history of working in warehouse and assembly jobs involving repetitive physical and heavy lifting duties.  He had no symptoms of carpal tunnel syndrome but had an abnormal result on the nerve conduction test.  Dirker told Buckley that he might have carpal tunnel syndrome and that males were more prone to developing carpal tunnel syndrome than females.

kk. Upon being told he could get a second opinion, Buckley saw a private physician who administered a nerve conduction test, which he passed.  Buckley took a letter from the physician to Defendant Employers but was told they would not hire him.

ll.  Marcus Humphries applied to work as a chipper, and he sought a second opinion after he was told he failed the nerve conduction test.  He paid $800 for another nerve conduction test which showed he had mild carpal tunnel syndrome, but the doctor who conducted the test fully released him to perform the chipper job.

mm.Upon returning to Defendant Employers with the doctor's release, he was told that he had to have carpal tunnel syndrome surgery and that he still might not be

9

hired.  When Humphries offered to sign a waiver, he was told he was not going to be hired.

nn. John Offermann applied to work as a chipper and was told that he was not qualified because he was at risk for developing carpal tunnel syndrome, Offermann then underwent carpal tunnel surgery, but when he returned to Defendant Employers and asked for reconsideration, he was rejected.

13.     The effect of the practices complained of in paragraph 12 above has been to deprive Montrell Ingram, Robert Blaylock, Terrance Buckley, Marcus Humphries, John Offermann, and other similarly aggrieved chipper applicants of equal employment opportunities and otherwise adversely affect their status as an applicant because of disability.

14.     The unlawful employment practices complained of in paragraph 12 above were intentional.

15.     The unlawful employment practices complained of in paragraph 12 above were done with malice or with reckless indifference to the federally protected rights of Montrell Ingram, Robert Blaylock, Terrance Buckley, Marcus Humphries, John Offermann, and other similarly aggrieved chipper applicants who were denied employment because of the results of their nerve conduction tests and / or because they had a record of carpal tunnel syndrome.

<u>PRAYER FOR RELIEF</u>

Wherefore, the Commission respectfully requests that this Court:

A.    Grant a permanent injunction enjoining Defendant Employers, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them from failing to hire individuals because of the results of nerve conduction test or a prior record of carpal tunnel syndrome.

B.    Grant a permanent injunction enjoining Defendant Employers, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them from failing to hire job applicants or otherwise engaging in unlawful employment practices on the basis of disability.

C.    Order Defendant Employers to institute and carry out policies, practices, and programs which provide equal employment opportunities for qualified individuals with disabilities and which eradicate the effects of its past and present unlawful employment practices.

D.    Order Defendant Employers to make whole Montrell Ingram, Robert Blaylock, Terrance Buckley, Marcus Humphries, John Offermann, and other similarly aggrieved chipper applicants by providing appropriate back pay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including but not limited to rightful place hiring of Montrell Ingram, Robert Blaylock, Terrance Buckley, Marcus Humphries, John Offermann, and other similarly aggrieved chipper applicants.

E.    Order Defendant Employers to make whole Montrell Ingram, Robert Blaylock, Terrance Buckley, Marcus Humphries, John Offermann, and other similarly aggrieved chipper

applicants by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in paragraph 12 above, including job search expenses and out of pocket medical expenses which would have been covered by Defendant Employers' health insurance plan, as a result of Defendant Employers' refusal to hire them, in amounts to be determined at trial.

F.    Order Defendant Employers to make whole Montrell Ingram, Robert Blaylock, Terrance Buckley, Marcus Humphries, John Offermann, and other similarly aggrieved chipper applicants by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of in paragraph 12 above, including emotional pain and suffering, in amounts to be determined at trial.

G.    Order Defendant Employers to pay Montrell Ingram, Robert Blaylock, Terrance Buckley, Marcus Humphries, John Offermann, and other similarly aggrieved chipper applicants punitive damages for its malicious and reckless conduct, as described in paragraph 8 above, in amounts to be determined at trial.

H.    Grant such further relief as the Court deems necessary and proper in the public interest.

I.    Award the Commission its costs of this action.

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by its complaint.

P. DAVID LOPEZ
General Counsel

JAMES L. LEE
Deputy General Counsel

GWENDOLYN YOUNG REAMS
Associate General Counsel

ANDREA G. BARAN, MO Bar No. 46520
Regional Attorney

C. FELIX MILLER, MO Bar No. 28309
Supervisory Trial Attorney

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
St. Louis District Office
1222 Spruce St., Room 8.100
St. Louis, MO 63103
(314) 539-7914 (telephone)
(314) 539-7895 (fax)
andrea.baran@eeoc.gov
felix.miller@eeoc.gov

/s/ Patrick J. Holman _____
PATRICK J. HOLMAN, OBA No. 21216
Senior Trial Attorney

JEFF A. LEE, OBA No. 13483
Senior Trial Attorney

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Oklahoma City Area Office
215 Dean A. McGee Ave., Suite 524
Oklahoma City, OK 73102
(405) 231-4363 (telephone)
(405) 231-4375 (fax)
patrick.holman@eeoc.gov
jeff.lee@eeoc.gov

13