**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT** | ) | |
| **OPPORTUNITY COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:14-cv-1292-JPG-SCW** |
| **v.** | ) | |
| | ) | |
| **AMSTED RAIL CO., INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**EEOC'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY AND
AMSTED'S "DIRECT THREAT" DEFENSE AND BRIEF IN SUPPORT**

PATRICK J. HOLMAN
Senior Trial Attorney

JEFF A. LEE
Senior Trial Attorney

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Oklahoma City Area Office
215 Dean A. McGee Ave., Ste 524
Oklahoma City, OK 73102

GRANT R. DOTY
Trial Attorney

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
 St Louis District Office
1222 Spruce Street, #8.100
St. Louis, MO 63103

**Table of Contents**

Table of Contents…………………………………………………………………ii

Table of Authorities………………………………………………………………iii

I.      EEOC's Statement of Undisputed Material Facts………………………….…1

II.     EEOC is Entitled to Summary Judgment on Liability…………………….…...9

        A.  The uncontroverted facts establish Amsted violated the
            ADA in refusing to hire Ingram and claimants because of
            "disability."……………………………………………………….….9

            1.  Ingram and claimants were "disabled" under the ADA……………….…9

            2.  Claimants and Ingram were "qualified individuals" under the ADA…..12

            3.  Amsted failed to hire claimants and Ingram because of disability…..….13

        B.  The uncontroverted facts establish Amsted also violated the ADA
            when it required claimants placed on "medical hold" to obtain an
            outside NCT at their own expense…………………………………..13

III.    EEOC is Entitled to Summary Judgment on Amsted's Affirmative
        Direct Threat Defense…………………………………………………..16

        A.  Amsted's direct threat defense must fail as the uncontroverted facts
            establish that its decision to reject the claimants was not based on
            an individualized assessment, nor the most current medical
            knowledge/best available objective evidence…………………………16

            1.  Amsted's "direct threat" defense fails as to all claimants……………...17

            2.  Amsted's "direct threat" defense fails as to Ingram……………….......19

IV.     Conclusion……………………………………………………………..20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amadio v. Ford Motor Co.*,
   238 F.3d 919 (7th Cir. 2001) ...................................................................................11

*Becker v. Tenenbaum-Hill Assoc., Inc.*,
   914 F.2d 107 (7th Cir. 1990) ....................................................................................9

*Bodenstab v. Cty. of Cook*,
   569 F.3d 651 (7th Cir. 2009) ..................................................................................16

*Branham v. Snow*,
   392 F.3d 896 (7th Cir. 2004) .....................................................................16, 17, 20

*Carothers v. Cty. of Cook*,
   808 F.3d 1140 (7th Cir. 2015) ...................................................................................9

*Chevron U.S.A. Inc. v. Echazabel*,
   536 U.S. 73 (2002) ...........................................................................................16, 17

*Darnell v. Thermafiber, Inc.*,
   417 F.3d 657 (7th Cir. 2005) ..................................................................................16

*EEOC v American Tool & Mold, Inc.*,
   21 F.Supp. 3d 1268, 1286 (M.D. Fla. 2014) ..........................................................14

*EEOC v BNSF Railway Co.*,
   2016 WL 98510 (W.D.Wash. Jan. 8, 2016) ........................................ 12, 13, 14, 15

*EEOC v. Rexnord Indus., LLC*,
   966 F. Supp. 2d 829 (E.D. Wis. 2013) ...................................................................17

*EEOC v. Staffmark Inv. LLC*,
   67 F. Supp. 3d 885, 895 (N.D. Ill. 2014) .........................................................11, 12

*Graham v. St. John's UMC*,
   2012 WL 5298156 (S.D.Ill. 2012) ..........................................................................10

*Haggins v. Sam's E., Inc.*,
   2015 WL 5781390 (D.S.C. 2015) ...........................................................................10

*Holiday v. City of Chattanooga,*
   206 F.3d 637 (6th Cir. 2000) ................................................................................17

*Lowe v. Ala. Power Co.,*
   244 F.3d 1305 (11th Cir. 2001) ............................................................................17

*McVey v. S. Illinois Univ.,*
   2013 WL 6632009 (S.D. Ill. 2013) ......................................................................12

*" Nowak v. St. Rita High Sch.,*
   142 F.3d 999 (7th Cir. 1998) ...............................................................................12

*Ortiz v. Werner Enter., Inc.,*
   2016 WL 4411434 (7th Cir. 2016) .........................................................................9

*Richmond v. UPS Serv. Parts Logistics,*
   2002 WL 745588 (S.D. Ind. 2002) ......................................................................12

*Sch. Bd. of Nassau County, Fla., v. Arline,*
   480 U.S. 273 (1987) .............................................................................................19

*Silk v. Bd. of Trustees, Moraine Valley Cmty. Coll., Dist. No. 524,*
   795 F.3d 698 (7th Cir. 2015) ...............................................................................11

*Steffen v. Donahoe,*
   680 F .3d 738, 743–44 (7th Cir. 2012) .................................................................11

**Statutes**

42 U.S.C. § 12102(1)(B) .................................................................................................11

42 U.S.C. § 12102(1)(C) .................................................................................................12

42 U.S.C. § 12102(2)(A),(B) ..........................................................................................10

42 U.S.C. § 12102(2)(A),(B),(C) ......................................................................................9

42 U.S.C. § 12102(4)(D) .................................................................................................10

42 U.S.C. § 12112(a). Effective January 1, 2009, the ADA Amendment's Act of 2008 ........................9

ADA ..........................................................................................................................*passim*

ADAAA...............................................................................................................9,10, 11

Pub. L. No. 110–325, Sept. 25, 2008, 122 Stat 3553 (codified at 42 U.S.C. §§ 12101 *et
   seq.*) .....................................................................................................................9

**INTRODUCTION**

Plaintiff EEOC moves for summary judgment on Amsted Rail's liability and affirmative defense. The undisputed material facts establish that, after making offers of employment conditioned upon passing a pre-employment medical exam, Amsted violated the Americans with Disabilities Act of 1990 (ADA) when it refused to hire Charging Party Montrell Ingram as a chipper because he had a "record of" disability and also "regarded" him as disabled, and violated the ADA when it refused to hire thirty-nine additional claimants as chippers because it "regarded" them as disabled because they tested "abnormal" on Amsted's pre-employment nerve conduction test (NCT). Amsted also violated the ADA by requiring the claimants to obtain a new NCT at their own expense in order to progress through the employment process. Finally, EEOC is entitled to summary judgment on Amsted's affirmative "direct threat" defense.

**BRIEF IN SUPPORT**

**I.   EEOC'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Amsted employs "chippers" to remove imperfections and finish the surface of steel side frames and bolsters that it manufactures at its Granite City facility.[1]  Starting in October 2010 and throughout 2011, Amsted had a surge in hiring chippers.[2] Amsted determined which applicants were experienced and qualified for the chipper job and extended them an offer of employment conditioned upon their successful completion of a pre-employment medical examination.[3]

Amsted contracted with Midwest Occupational Medicine (Midwest), owned by George Dirkers, M.D., to perform its onsite medical exams.[4] The purpose of the exam was to determine

---

[1] (Ex. 6, Dockery Dep. 31:1-32: 6); (Ex. 4, Chipper Job Description); (Ex. 5, Talbot Dep. 25:10-14);
[2] [Doc. 38, Amsted Resp to RFA 5]; (Ex. 6, Dockery Dep. 28:15-21); (Ex. 2, Ferguson Dep. 23:10-12) (any hires after Oct. 2010 were ineligible for pension benefits).
[3] (Ex. 5, Talbot Dep. 43:20- 46:2; 55:18-56:8); [Doc. 38, Amsted Resp to RFA 6].
[4] (Ex. 1, Dirkers Dep. 15:18-24; 17:22-18:9; 22:13-24; 25:6-17; 51: 25-52: 4); [Doc. 38, Amsted Resp to RFA 7-8]; (Ex. 5, Talbot Dep. 55:18- 57:5); (Ex. 7, Hayes Dep. 17:1-2).

whether an applicant was physically and medically able to perform the chipper job, and included: a drug screen and background check, applicants submitted to a pre-employment medical exam that included a medical questionnaire, vitals, vision and hearing assessments, a nerve conduction test ("NCT") using its Neurometrix NC-Stat device (NC-Stat), and a complete physical exam.[5] Applicants found "not medically qualified" or placed on "medical hold pending further data" were denied advancement through the employment process.[6]

### *Amsted's medical exam sought to screen chipper applicants for CTS.*

CTS is a condition concerning entrapment of the median nerve at the wrist and affects and impairs the body's nervous and musculoskeletal systems; above all else, CTS is a clinical syndrome, meaning that it is defined and characterized in part by the presence of physical symptoms such as weakness, numbness, tingling, muscle dysfunction, and pain in the arm and hands resulting in loss of sensation, power and dexterity.[7] CTS is not life threatening, and can be treated.[8]  A common and often successful treatment is CT release surgery.[9] At Amsted, when a chipper developed CTS, he was often successfully treated and transferred to a different job.[10]

Around 2003, Amsted bought the Neurometrix NC-Stat device as a "cheap, fast, and easy" means to conduct a pre-employment NCT on chipper applicants to "help predict who might get CTS" – and thereby reduce its workers' compensation costs.[11] Midwest used the NC-Stat to measure

---

[5] (Ex. 1, Dirkers Dep. 52:5-53:4; 58:19-59:24; 64:10-67:9; 87:15-23); (Ex. 7, Hayes Dep. 35:4-36:22).
[6] (Ex. 1, Dirkers Dep. 85:19- 86:23; 146:4-147:11); (Ex. 11, PrePlacement Report); (Ex. 7, Hayes Dep. p.40: 13 – p.43: 6); (Ex. 5, Talbot Dep. 61:6-62: 6).
[7] (Ex. 1, Dirkers Dep. 57:5-12; 161:6-162:3); (Ex. 21, Franzblau Dep. 28:16-21); (Ex. 15, Franzblau Dec. at ¶ 2).
[8] (Ex. 1, Dirkers Dep. 164:21-24; 165: 3-4); (Ex. 15, Franzblau Dec. at ¶ 3).
[9] (Ex. 1, Dirkers Dep. 155:22- 156: 11; 185:18-25; 235:22-236:1); (Ex. 19, Katz Dep. 114:21-22).
[10] (Ex. 1, Dirkers Dep. 18:2-8; 186:3-19; 188:24-189:16; 249:21-250:4); (Ex. 8, Midwest 30(b)(6) Dep. 80:18-81:8); [ Doc. 71, Amsted Resp to 3d RFA 451, 452, pp.7-8].
[11] (Ex. 5, Talbot Dep. 82:19-84:17); (Ex. 2, Ferguson Dep. 19:5-22; 31:13-32:10;33:6-9; 36:6-38:23; 40:17-41:23; 45:4-47:12; 48:19-50:9; 51:7-19, 23-25; 53:1-8; 55:20-25; 56:19-23; 62:2-4; 64:17-21);

the distal motor latency (DML) of the median nerve of an applicant's dominant hand and classify it as normal or abnormal.[12] Every applicant with an "abnormal" NCT result was placed on "medical hold pending further data" and his progress through the hiring process was halted.[13] No medical determination was made concerning those put on "medical hold" - they were "in limbo."[14] Amsted would only hire these applicants if, at their own expense, they underwent an outside NCT and produced a "normal" result for review by Dr. Dirkers to "prove [Amsted] wrong."[15]

> ### *Amsted's use of the NC-Stat NCT results to disqualify applicants for chipper jobs was not supported by the most current medical knowledge and did not constitute the best available objective evidence of a claimant's ability to safely work as a chipper.*

The NC-Stat device provided only a laboratory measurement and could not accurately determine whether a person was at risk of developing CTS in the future, or indeed whether he presently had CTS.[16] An asymptomatic individual with an "abnormal" NCT is not actually impaired

---

(Ex. 19, Katz Dep 20:20-21; 32:12-19; 36:18-25; 49:2-15); (Ex. 12, *NC Stat as a Screening Tool for CTS in Industrial Workers* (Katz 2006) at pp. 414-15); (Ex. 7, Hayes Dep. p.27: 4-6); (Ex. 6, Dockery Dep. 86:20-22); (Ex. 9, Amsted Resp to 6th RFI # 26); (Ex. 1, Dirkers Dep. 28:21-24; 31:12-24; 34:5-23; 47:12-23; 228:17-23); (Ex. 8, Midwest 30(b)(6) Dep. 15:3-14; 16:9-20; 37:23-38:1).

[12] (Ex. 7, Hayes Dep. 53:11-54:20; 57: 2-23; 58: 3-59:11); (Ex. 1, Dirkers Dep. 118:3-11; 119: 5-11; 121:2-17; 122:13-17); (Ex. 15, Franzblau Dec. ¶ 5).

[13] (Ex. 1, Dirkers Dep. 46:10-47:23; 110:11-21; 111:5-19; 115:4-8; 136:21-137:16; 143:18-144:12); (Ex. 8, Midwest 30(b)(6) Dep. 23:17-23; 28:5-29:7); (Ex. 17, Swan-Moore Dep. 10:6-11, 19-21; 11: 6-10; 14:23-16:2; 22:12-23:18; 28:22-25; 45:8-23); (Ex. 20, Dr. Burris Dep. 11:15-25; 23:21-24:23; 25:6-14); [Doc. 38, Amsted Resp to RFA 27]; (Ex. 7, Hayes Dep. 99:4-9).

[14] (Ex. 1, Dirkers Dep. 93:4-95:25); (Ex. 17, Swan-Moore Dep. 39:25-40:13) ("I was told that we put them on hold. So I really didn't make a decision as to whether or not they could perform [the job] safely."); (Ex. 7, Hayes Dep. 33:9-11; 40:13-43:1; p.52: 9-16; p.73: 2-11; p.92: 4-25); (Ex. 5, Talbot Dep. 65:6-20; 72:1-3; 79:17-25).

[15] (Ex. 1, Dirkers Dep. 41:22-42:6; 46:10-47:7; 146:23-147:22; 228: 2-6); (Ex. 7, Hayes Dep. 42:5-43:16; 64:3-20; 65:25-67:6; 68:25-69:2; 80:21-81:12); (Ex. 6, Dockery Dep. 81:14-18; 82:4-8; 122:8-123:10); [Doc. 71, Amsted Resp to RFA 466]; (Ex. 8, Midwest 30(b)(6) Dep. 23:17-25:12; 41:23-42:5); [Doc. 38, Amsted Resp to RFA 27]; (Ex. 17, Swan-Moore Dep. 22:12-23:2, 13-20; 25:1-4)

[16] (Ex. 1, Dirkers Dep. 72:13-15;122:18-123:13; 124:25-125:1, 14-16; 130:2-25; 143:5-9; 213:5-7) (stating an abnormal result is not a symptom of CTS); (Ex. 17, Swan-Moore Dep. 42:1-7); (Ex. 21, Franzblau Dep. 45:16-20; 59:4-25; 134:15-22); (Ex. 20, Burris Dep. 11:15-25; 33:25-34:3); (Ex. 15, Franzblau Dec. ¶¶ 4,9,10,12); (Ex. 22, Rosecrance Dep. 41:20-42:10; 55:9-19; 72:7-14; 73:11-18; 74:24-75:8; 88:12-23; 150:22-151:7); (Ex. 14, NC-Stat OnCall report - redacted) (disclaiming

in any way and requires no treatment.[17] The NCT's positive predictive value (PPV) – the proportion of those who test positive on the test and later develop CTS – is low, less than twenty percent.[18] The ability of the NC-Stat or any other NCT to determine an applicant's current and future ability to safely perform the chipper job is speculative.[19] Indeed, there is no medical literature providing empiric support for the idea that a NCT, regardless of the device, can reliably predict future development of CTS; rather, in 2011 and today, the medical literature supports the opposite: a large majority of people with few or no symptoms of CTS who have an "abnormal" NCT result will not develop CTS.[20]

Amsted's consulting physician on CTS for the last seventeen years, Dr. Richard T. Katz, studied Amsted's pre-employment use of NCT between 2003 and 2005, and concluded in 2006 that "the NC-Stat evaluation . . . is an ineffective method of screening for or diagnosing CTS in industrial workers…[it] significantly overdiagnoses CTS in an asymptomatic population of industrial workers [raising] serious concerns about the validity of 'positive' [results]."[21] Notwithstanding, Amsted consistently relied on the same NC-Stat NCT to deny the job of chipper to claimants with an "abnormal" result.[22]

---

"electrodiagnostic results supplement the patient examination; a clinical diagnosis must be made by a physician in the context of all available information.").

[17] *Id.*

[18] (Ex. 21, Franzblau Dep. 79:7-17; 81:23-83:1; 87:10-22; 88:5-10; 104:8-12; 111:1-8, 21-112:7; 124:15-16); (Ex. 22, Rosecrance Dep. 109:8-24; 113:7-117:8; 123:19-22; 127:23-128:23; 129:7-8; 144:15-145:2; 147:21-25; 148:11-15); (Ex. 15, Franzblau Dec.¶¶ 11-13)

[19] (Ex. 1, Dirkers Dep. 44:16-45: 1; 130: 22-25; 131:22-132:1; 157: 4-18; p.158: 1-2; 165:15-166:24); (Ex. 22, Rosecrance Dep. 73:5-7; 74:24-75:8; 152:4-20); (Ex. 5, Katz Dep. 119:14-120:5; 132:6-9). (Ex. 8, Midwest Dep. 73:23-75:20); (Ex. 17, Swan-Moore Dep. 38:1-39:14; 42:1-7);

[20] (Ex. 15, Franzblau Dec. ¶¶ 9, 10); (Ex. 21, Franzblau Dep. 19:19-22; 50:12-20; 121:1-25); (Ex.19, Katz Dep. 100:2-7); (Ex. 1, Dirkers Dep. 130:22-25; 214:6-25; 216:19-218:5).

[21] (Ex. 19, Katz Dep. 18:13-19:15; 32:12-33:16; 36:11-25; 40:7-13; 41:7-9; 42:3-6; 46:12-47:3-23; 48:1-3; 50:4-51:5; 53:16-54:7; 65:1-6); (Ex. 12, *NC-stat as a Screening Tool for [CTS] in Industrial Workers* (Katz 2006)); (Ex. 27, Amsted 30(b)(6) Dep. 93:15-95:1).

[22] (Ex. 1, Dirkers Dep. 107:16-108:3; 121:9-17; 122:13-17); *see* FN 12.

A seminal study on the use of NCT (including NC-Stat) was Dr. Alfred Franzblau's 2004 six-year retrospective cohort study "*PrePlacement Nerve Testing for [CTS]: Is it cost effective?*" - wherein Dr. Franzblau found that only 13 of 327 workers studied with an "abnormal" NCT result went on to develop CTS, and concluded that such tests were not effective pre-employment screening devices.[23] The vast majority of individuals who have an "abnormal" NCT result do not develop CTS.[24] Tellingly, Amsted does not claim that its use of NCT (abandoned in June 2012) has reduced the number of CTS work comp claims among chippers at Amsted.[25]

A goal of Amsted's NCT was to diagnose, "in a sense," current CTS.[26] Current medical knowledge (both now and in 2011) was that a patient should first be asked whether or not he had any symptoms of CTS, and if so, then a supplemental physical test (e.g. Phalen test or Tinel test) and/or a NCT should be administered to reliably determine whether a person has CTS.[27] But Amsted either did not obtain information about CTS symptoms from any of the claimants or ignored such information if inconsistent with the NC-Stat result; moreover, it performed physical tests on only ten claimants and ignored those results that were inconsistent with an NC-Stat result. [28]

---

[23] (Ex. 15, Franzblau Dec. ¶ 13); (Ex. 38, *PrePlacement Nerve Testing for [CTS]: Is it cost effective?* (Franzblau 2004)).

[24] (Ex. 15, Franzblau Dec. ¶¶ 10-12)

[25] (Ex. 1, Dirkers Dep. 39:8-16); (Ex. 2, Ferguson Dep. 62: 12 – 63:9);(Ex. 10, Amsted 2d Supp Resp to 1st RFI 12);

[26] (Ex. 1, Dirkers Dep. 39:17-21; 54:18-20); (Ex. 8, Midwest 30(b)(6) Dep. 48:14-20).

[27]  (Ex. 8, Midwest 30(b)(6) Dep. 29:13-30:25; 50:7-12, 17-53:1); (Ex. 15, Franzblau Dec. ¶ 4); (Ex. 19, Katz Dep. 8:5-23; 60:12-21; 74:12-17; 76:9-23) ("you've got to have symptoms, or you don't have the problem," and stating it "makes sense" in a screening context to ask people about symptoms if you want to find out if they have CTS); (Ex. 21, Franzblau Dep. 46:13-15); (Ex. 22, Rosecrance Dep. 20:1-21:5; 55:9-19); (Ex. 1, Dirkers Dep. 54:9-20; 127:1-2; 128:3-6, 13-15; 150:20-23).

[28] (Ex. 21, Franzblau Dep. 40:24-41:6;  43:12-19; 46:1-15); (Ex. 15, Franzblau Dec. ¶¶ 6(i)-(iii), 7); (Ex. 1, Dirkers Dep. 74:1-76:16; 79:2-21; 80:10-85:13; 111:11-19; 115:4-8; 127:11-15; 137:22-141:3; 141:1-3); (Ex. 17, Swan-Moore Dep. 25:14-27:3, 15-28:25; 34:20-24; 35:18-22); (Ex. 20, Burris Dep. 11:15-25; 25:6-14); (Ex. 7, Hayes Dep. 39:17-21).

*Amsted did not hire thirty-nine claimants because their NC-Stat NCT results were "abnormal" and Amsted feared they might develop carpal tunnel syndrome.*

During its hiring surge, Amsted made conditional job offers to thirty-nine claimants, and then placed each on "medical hold" because of an "abnormal" NCT result.[29]  Amsted believed each claimant could have performed the chipper job at the time of the "hold," but, because of their "abnormal" NCT, it alleges they could not have done so safely.[30] Claimants were put on "hold" without an individual assessment of whether they could safely perform the chipper job.[31] Contrary to established medical knowledge, Dr. Dirkers, believed an "abnormal" NCT alone suggested each claimant "more or less had [CTS]."[32] Most claimants were unable to obtain the outside NCT needed to challenge their "hold," because they could not pay the $600 - $880 cost.[33]  Although it could have, Amsted did not administer a broader hospital-based or neurologist administered NCT that applicants on "medical hold" were directed to obtain, because it was too expensive.[34] Claimants

---

[29] (Ex. 8, Midwest 30(b)(6) Dep. 22:2-25:5; 72:11-73:12); [Doc. 38, Amsted Resp to RFA #'s  33, 41, 49, 65, 73, 97, 121, 129, 137, 145, 153, 161, 169, 177, 193, 201, 209, 225, 233, 249, 257, 265, 281, 289, 297, 305, 321, 329, 337, 345, 353, 361, 369, 385, 393, 401, 409, 425, 433]; (Ex. 37, Amsted Resp to 1st RFI 2); (Ex. 10, Amsted 2d Supp Resp to 1st RFI #'s 3, 4); [Doc. 71, Amsted Resp to 3d RFA # 455, page 10]; (Ex. 15, Franzblau Dec. ¶ 8)

[30] (Ex. 8, Midwest 30(b)(6) Dep. 76:19-77:6); (Ex. 17, Swan-Moore Dep. 40:8-25); (Ex. 1, Dirkers Dep. 43:23-44:10; 208:12-209:7); (Ex. 19, Katz Depo. 89:20-90:4)

[31] (Ex. 17, Swan-Moore Dep. 27:22-28:8, 22-25; 34:20-24; 35:18-22; 40:14-25) ("I was told … put them on hold. So I really didn't 6 make a decision as to whether or not they could perform [the job] safely."); (Ex. 1, Dirkers Dep. 140:17-141:18; 157:4-18; 166:25-168:19).

[32] (Ex. 1, Dirkers Dep 55:10-56:9); *see also* FN 13, 14, 16-25.

[33] (Ex. 19, Katz Dep. 10:15-11:16); (Ex. 31, Bates Dep. 35:17-36:8); (Ex. 3, Abdallah Dep. 41:5-42:2); (Ex. 36, Dougherty Dep. 22:1-23:18); (Ex. 26, McCartney Dep. 20:19-21:11); (Ex25, Henderson Dep. 35:1-36:20); (Ex. 8, Midwest 30(b)(6) Dep. 24:7-25:12; 29:19-30:25; 41:6-15); (Ex. 1, Dirkers Dep. 132:21-133:1; 141:10-18; 226: 3-7; 227:8-228:6)

[34] (Ex. 1, Dirkers Dep. 228:24-230:1).

providing outside medical information (other than a "normal" NCT result) supporting that they did

not have CTS and/or were medically cleared to work, were nevertheless not hired as chippers.[35]

There were additional medical reasons unrelated to an abnormal NCT for placing a medical

hold on six claimants (Allen, Bates, Cade, Harvey, Offerman, and Rives), but the additional medical

holds were ultimately removed for all of the claimants except one (Offerman).[36]  Thus, all claimants

(except Offerman and Ingram) were not hired solely because of their NC-Stat NCT.

### *Amsted did not hire Ingram because he previously had carpal tunnel surgery.*

Montrell Ingram was the only claimant who previously had surgery for CTS. In 2006,

Ingram began to suffer uncomfortable and painful symptoms of CTS, which worsened at night, and

substantially impaired his ability to sleep, concentrate, and perform every day manual tasks such as

operating tools and even holding a glass and similarly substantially impaired the function of his

nervous and musculoskeletal system.[37] Ingram was diagnosed with CTS in December 2006.[38]

Ingram underwent successful bilateral CT surgery and, after a month of missed and/or severely

restricted work resulting from the treatment, was fully released to his former job in March 2007.[39]

When he applied at Amsted in November 2010, Ingram's doctor had concluded that he

could do work that required vibratory tools and repetitive motion.[40] Amsted determined that Ingram

was qualified for the job and thus made a conditional offer of employment dependent upon him

---

[35] (Ex. 30, claimant medical file excerpts: Holmes; Manning; Robinson); (Ex. 32, Holmes Dep. 22:16-27:5); (Ex. 33, Jimerson Dep. 48:2-51:25); (Ex. 34, Manning Dep. 34:1-37:6); (Ex. 35, Robinson Dep. 34:12-36:19)

[36] (Ex. 10, Amsted 2d Supp Resp to 1st RFI #'s 3, 4); [Doc. 71, Amsted Resp to 3d RFA # 455, page 10]; (Ex. 16, Cade medical file cover page indicating injury docs produced).

[37] (Ex. 23, Ingram CTS medical records); (Ex. 28, Ingram Declaration at ¶¶ 1-3); *see also* FN 8.

[38] (Ex. 28, Ingram Declaration at ¶¶ 4-5)

[39] (Ex. 23, Ingram CTS medical records); (Ex. 28, Ingram Dec. at ¶¶ 3-13)

[40] (Ex. 18, Ingram Dep. 50:16-51:3; 61:19-62:22); (Ex. 28, Ingram Dec. ¶¶ 10-13 & Ex. 1 thereto)

passing its medical exam.[41] At his exam, Ingram disclosed his prior CT surgery to Amsted. Amsted declared him "medically disqualified" and revoked its conditional offer of employment because of his prior CT surgery.[42]  Amsted "medically disqualified" Ingram, even though since his surgery he was asymptomatic for CTS, he tested "normal" on Amsted's NCT, and Amsted considered him to be physically able to perform the chipper job.[43]

> *Amsted's use of Ingram's prior carpal tunnel surgery to disqualify him was not supported by the most current medical knowledge and did not constitute the best available objective evidence of his ability to safely work as a chipper.*

Dr. Dirkers claims to have relied on a 1994 case series by Suzanne Strasberg, M.D., when he disqualified Ingram out of fear he may redevelop CTS and require a second CT surgery; in which case, Dirkers speculated there would exist a 72% chance he would become "totally disabled."[44]  But Amsted's own expert, Dr. Katz, agreed it was an overreach to use Strasberg's 1994 study to assess Ingram's risk.[45]  Indeed, the Strasberg study did not enable one to calculate Ingram's risk,[46] and his clinical profile did not match that of the 45 patients studied because Ingram had full relief of his symptoms after surgery, could work without restrictions, remained asymptomatic, and had a "normal" NCT on his 2011 Amsted exam.[47] Also, Dirker admitted the study was likely outdated.[48]

---

[41] (Ex. 29, Ingram: Amsted application); (Ex. 5, Talbot Dep. 42:15-44:12); (Ex. 18, Ingram Dep. 62:23-68:14)

[42] (Ex. 1, Dirkers Dep. 88:15-17; 135:15-23; 169: 17-21; 170:8-171:14); (Ex. 13, Ingram – disclosure & pre-placement report); [Doc. 38, Amsted Resp to RFA 21]; (Ex. 18, Ingram Dep. 67:10-16; 69:1-23; 70:9-71:3); (Ex. 8, Midwest 30(b)(6) Dep. 38:8-21; 76:19-77:16);

[43]  (Ex. 15, Franzblau Dec. ¶¶ 15-16); (Ex. 13, Ingram's "normal" ex. 16NCT); (Ex. 1, Dirkers Dep. 171:11-172:4; 182:5-12; 183:17-184:1; 208:17-209:7; 237:8-11, 25-238:6); (Ex. 8, Midwest 30(b)(6) Dep. 76:19-77:16); (Ex. 21, Franzblau Dep. 63:8-64:7; 64:4-22)

[44] (Ex. 1, Dirkers Dep. 89:6-23; 176: 5-177:21; 182:5-17; 183: 1-16; 188:11-17; 240: 14-16); (Ex. 8, Midwest 30(b)(6) Dep. 44:17-45:1); (Ex. 24, Strasberg (1994) study).

[45] (Ex. 19, Katz Dep. 114:1-14; 115:1-6, 16-19; 120:6-11); (Ex. 15, Franzblau Dec. ¶ 16).

[46] (Ex. 21, Franzblau Dep. 64:8-22); (Ex. 15, Franzblau Dec. ¶¶ 15-16);

[47] (Ex. 1, Dirkers Dep. 171:11-172:4; 183:1-20; 231: 1-238:6); (Ex. 28, Ingram Dec. ¶¶ 10-13 & Ex. 1); (Ex. 18, Ingram Dep. 40:5-23; 110: 5-10, 20-25); (Ex. 21, Franzblau Dep. 64:8-22); (Ex. 19, Katz Dep. 115:1-6).

II.     **EEOC IS ENTITLED TO SUMMARY JUDGMENT ON LIABILITY.**

Movants have the burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law; in responding, the non-movant may not rest upon mere allegations or denials, but must set forth specific facts showing a genuine issue for trial. *Becker v. Tenenbaum-Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); Fed. R. Civ. P. 56. Here, the EEOC has met its burden.

A.     **The uncontroverted facts establish Amsted violated the ADA in refusing to hire Ingram and claimants because of "disability."**

The ADA prohibits employers from refusing to employ "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Effective January 1, 2009, the ADA Amendment's Act of 2008 (ADAAA) reinstated "a broad scope of protection" for disabled employees. Pub. L. No. 110–325, Sept. 25, 2008, 122 Stat 3553 (codified at 42 U.S.C. §§ 12101 *et seq.*). The EEOC must show claimants (1) are disabled; (2) were qualified to perform essential job functions (with or without reasonable accommodation); and (3) suffered an adverse employment action because of disability. *Carothers v. Cty. of Cook*, 808 F.3d 1140, 1147 (7th Cir. 2015). Evidence, whether direct or indirect, "must be considered as a whole." *Ortiz v. Werner Enter., Inc.*, 2016 WL 4411434, *5 (7th Cir. 2016).

1.     **Ingram and claimants were "disabled" under the ADA.**

The ADA defines disability as (a) a physical or mental impairment that substantially limits one or more major life activities or bodily systems of an individual; (b) a record of such impairment; or (c) being "regarded as" having an impairment. 42 U.S.C. § 12102(2)(A),(B),(C).

*"Record of" disability*

The ADA's "record of" provision ensures that people are not discriminated against because of a history of disability. 29 C.F.R. pt.1630, App § 1630.2(k). "For example, [this] provision would

---

[48] (Ex. 1, Dirkers Dep. 240:11-16)

protect an individual who was treated for cancer ten years ago[,] but who is now deemed by a doctor to be free of cancer, from discrimination based on that prior medical history." *Id.* "[A] record of a disability [may be found] if the individual has a history of an impairment that substantially limited one or more major life activities [or bodily functions] when [active as] compared to most people in the general population." 29 C.F.R. § 1630.2(k); 42 U.S.C. § 12102(4)(D).

The ADAAA expanded "major life activity" to include not only, for example, "performing manual tasks, sleeping, lifting, concentrating" but also "the operation of major bodily functions," including the "musculoskeletal" function. 42 U.S.C. § 12102(2)(A),(B); 29 C.F.R. § 1630.2(i)(1).

> [T]the major life activity of performing manual tasks . . . could have many different manifestations, such as [those] involving fine motor coordination, or . . . grasping, hand strength, or pressure. Such tasks need not constitute activities of central importance to most people's daily lives, nor must an individual show [he] is substantially limited in performing all manual tasks.

29 C.F.R. pt.1630, App § 1630.2(i).

Under the ADA and corresponding regulations, '[t]he term 'substantially limits' [is not a demanding standard and] shall be construed broadly in favor of expansive coverage." *Graham v. St. John's UMC,* 2012 WL 5298156 at *3 (S.D.Ill. 2012) (citing 42 U.S.C. 12102(4); 29 C.F.R. § 1630.2(j)(1)(i)). Accordingly, "the threshold issue of whether an impairment 'substantially limits' [a major life activity or bodily function] should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(1)(iii), (k); *see also Haggins v. Sam's E., Inc.*, 2015 WL 5781390, at *13 (D.S.C. 2015) (finding plaintiff's [CTS] to be a disability where it limited performance of manual tasks for over a one month period and restricted his or her  work).

The undisputed facts prove Ingram had a "record of" a disability. Beginning in 2006, Ingram experienced significant symptoms of CTS that included pain in his elbow and hand which worsened at night. *See* Statement of Fact at Footnote (FN) 7, 37-38. These symptoms substantially limited him in the major life activities of sleeping, concentrating, and performing manual tasks such as gripping,

pinching and lifting, as well as the function of his nervous and musculoskeletal system, compared to the general population. *Id.* Following formal diagnosis of CTS, Ingram underwent bilateral CT surgery in February 2007. FN 38-39. This surgery resulted in about a month of missed and restricted work before his release to full duty in March 2007. *Id.* At his 2011 pre-employment exam by Amsted, he disclosed his prior CT surgery. FN 5,42. Therefore, Ingram thus had a "record of" a disability. 42 U.S.C. § 12102(1)(B).

### *"Regarded as" disabled*

The purpose of "regarded as" claims is to prevent discrimination based on unfounded concerns, mistaken beliefs, myths, fears, stereotypes and prejudices associated with disabilities. *Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001); 29 C.F.R. pt. 1630 App. § 1630.2(l)). Under the Act, the EEOC must show Amsted perceived claimants and Ingram as having an impairment, "whether or not the impairment limits or is perceived to limit a major life activity." *Silk v. Bd. of Trustees, Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 706 (7th Cir. 2015) (citing 42 U.S.C. § 12102(3)(A)); *see also, Steffen v. Donahoe*, 680 F .3d 738, 743–44 (7th Cir. 2012) ("Prior to the [ADAAA], an employee was not 'regarded as' disabled... unless his employer believed [an] impairment substantially limited the employee in a major life activity."); *see also* 29 C.F.R. pt. 1630 App. § 1630.2(l ). Significantly, "[a]n employer that believes an employee is unable to perform the job safely . . . regards that employee as disabled." *EEOC v. Staffmark Inv. LLC*, 67 F. Supp. 3d 885, 895 (N.D. Ill. 2014) (citing 29 C.F.R. Pt. § 1630.2, App. § 1630.2(l).

The undisputed facts establish that claimants and Ingram were "regarded as" disabled. Ingram was "regarded as" disabled by Amsted because Amsted perceived him as a liability or risk because of his prior CT surgery. It "medically disqualified" and refused to hire him on that basis. FN 42. The thirty-nine claimants who tested "abnormal" on Amsted's NCT were also perceived by Amsted as liabilities or risks. Amsted placed them on "medical hold" and did not hire them on that

basis. FN 11-14, 29-32. As such, all claimants were "regarded as" disabled. 42 U.S.C. § 12102(1)(C);

*see also Staffmark*, 67 F. Supp. 3d at 895.

### 2. Claimants and Ingram were "qualified individuals" under the ADA.

"To be [a 'qualified individual' one] must 'satisfy the requisite skill, experience, education and

other job-related requirements of the employment position [desired]' and 'with or without

reasonable accommodation, [to] perform the [job's] essential functions.'" *McVey v. S. Illinois Univ.*,

2013 WL 6632009, at *8 (S.D. Ill. 2013) (citing 42 U.S.C. § 12111(8) and 29 C.F.R. § 1630.2(m)); *see*

*also* 29 C.F.R. § 1630.2(n). "The determination as to whether an individual is a 'qualified individual

with a disability' must be made *as of the time of the employment decision." Nowak v. St. Rita High Sch.,* 142

F.3d 999, 1003 (7th Cir. 1998) (emphasis added); *see also Richmond v. UPS Serv. Parts Logistics*, 2002

WL 745588, at *5 (S.D. Ind. 2002). ADA's regulations elaborate on this point, stating,

> [T]he determination of whether an individual with a disability is qualified is to
> be made at the time of the employment decision. *This determination should be*
> *based on the capabilities of the individual with a disability at the time of the employment*
> *decision, and should not be based on speculation that the employee may become unable in*
> *the future or may cause increased health insurance premiums or workers compensation*
> *costs.*

29 C.F.R. pt. 1630 App., § 1630.2(m) (emphasis added).

Amsted unequivocally determined that each claimant possessed the requisite background,

experience, skills and abilities to successfully perform the chipper job. FN 1-3, 29, 40, 41. It did so

when it extended offers of employment to each conditioned on passing its medical exam. *Id.*; see

also *EEOC v BNSF Railway Co.*, 2016 WL 98510, *8 14-cv-1488-MPJ (W.D.Wash. Jan. 8, 2016).

After comprehensive medical examinations, the only medically disqualifying factor that Amsted

found for Ingram was his prior CT surgery. FN 4-6, 41, 42. The only basis for placing thirty-three

claimants on "medical hold" was an "abnormal" NCT. FN 5, 11-14, 29-32. Amsted had separate

reasons for its "hold" on six claimants, in addition to their "abnormal" NCT. FN 36. However, for

five of the six claimants (except Offerman), the holds were lifted for other reasons after production of outside medical information. *Id.* Thus, the "abnormal" NCT result was the only basis for Amsted's "hold" and refusal to hire each. *Id.* Because Ingram and claimants were qualified to perform the job of chipper notwithstanding their respective prior CT surgery and "abnormal" NCT results, Amsted's identification of these "disabilities" as a basis for its discriminatory decisions does not render claimants "unqualified." *See also infra*, Part III.

### 3. Amsted failed to hire claimants and Ingram because of disability.

It is undisputed that, following its pre-employment medical exam, Amsted failed to hire Ingram because of his record of and/or perceived disability - prior CT surgery - and failed to hire the other claimants because it perceived them as disabled – an "abnormal" NCT. FN 11-15, 29-43.

### B. The uncontroverted facts establish Amsted also violated the ADA when it required claimants placed on "medical hold" to obtain an outside NCT at their own expense.

Amsted also violated the ADA when it required claimants placed on "medical hold" to obtain new, outside NCT at their own expense if they wanted their "hold" reconsidered and to continue through the Amsted hiring process.

In *BNSF Railway Co.*, 2016 WL 98510, charging party, Russell Holt, applied to be a patrol officer for BNSF and was extended an employment offer subject to passing a pre-employment medical exam. BNSF contracted with Comprehensive Health Services (CHS) to administer the exam. After an exam, CHS could either "clear" applicants or send them to BNSF's medical department for a decision. During his exam, Holt disclosed a prior back injury. In response, CHS requested copies of Holt's prior MRIs. Holt provided these records. After review, BNSF concluded it lacked sufficient information and requested Holt obtain and provide a current MRI at his expense (costing $2,000) in order to proceed with the hiring process. Because it was cost prohibitive, Holt did not get a new MRI, and BNSF treated him as having declined the position.

13

The EEOC sued BNSF under the ADA, and moved for and was granted summary judgment on liability. *Id.* at *1. Pointing out BNSF's conditional offer of employment, the court found Holt was "qualified" for the job. *Id.* at *8. It also found that Holt was "disabled" where he disclosed his prior back injury to BNSF. *Id.* at *7-8. Finally, the court found that BNSF's action was facial discrimination. *Id.*

The court also rejected BNSF's direct threat defense on the basis that "a direct threat assessment was never made because BNSF halted the hiring process when Holt failed to provide an MRI at his own cost." *Id.* at *8. It alternatively rejected the argument that a new MRI was necessary to BNSF's determination whether Holt posed a direct threat, because 29 C.F.R. § 1630.2(r) does not require an independent medical exam if the available evidence is clear. *Id.* The court reasoned:

> BNSF may not have been able to access 'the most current medical knowledge' about Mr. Holt's back condition unless it was willing to pay for it, but it could make the assessment based on the 'best available' evidence—i.e., the objective information it could glean from the medical examination its contractor had already performed and the records Mr. Holt was able to provide. Conversely, if BSNF nonetheless believed the MRI was necessary to a reliable direct-threat analysis, BNSF could have paid for the test.

*Id.* at *8-9.

In *EEOC v American Tool & Mold, Inc.*, 21 F.Supp. 3d 1268, 1286 (M.D. Fla. 2014), the court granted EEOC summary judgment on liability under similar facts. In that case, Michael  Matanic underwent a post-offer, pre-employment exam in 2011 in order to obtain a job with American Tool & Mold (ATM). In the exam, Matanic disclosed a prior back surgery. In response, ATM ruled Matanic "not fit" for employment unless he could prove otherwise. It did so without seeking to verify the existence of any residual problems resulting from the prior surgery. The court found Matanic "disabled" because Matanic made ATM aware of his prior surgery, and was "qualified" for the job since he met the necessary requirements. *Id.* at 1275-82. It also held that ATM failed in its obligation to evaluate Matanic's actual ability to perform the job. *Id.* The court observed that the

apparent reasons for ATM's actions were to dispel its fear of additional worker's comp claims or potential future injuries to Matanic – which are not permissible justifications under the ADA. *Id.* at 1284.  Finally, it held that ATM's direct threat defense was unavailable given the absence of an individualized assessment of Holt. *Id.* at 1285.

Like *BNSF,* Amsted engaged in facial discrimination when, based on a claimant's NCT results, it halted their progression through the post-conditional offer hiring process and required them, at their own effort and expense ($600-$800), to obtain and produce an outside "normal" NCT result to "prove wrong" Amsted's fears and assumptions about them – never rendering a medical determination. FN 6, 11-15,  29-35. Paradoxically, the outside NCT, to be obtained at each claimant's expense, was marred by the same problem as Amsted's NC-Stat: an abnormal result is not an accurate and reliable predictor of who may develop CTS. FN 16-25. For claimants placed on "medical hold pending further data" due to an "abnormal" NCT, the possibilities of lifting the "medical hold" were grim and financially burdensome. FN 33-35.

As in *BNSF,* Amsted could have paid for each claimant's outside NCT if it was necessary to complete its medical determination. FN 13-15, 31. It could have administered the outside NCT in its own pre-employment exam. FN 34. It could have also based its determinations on an individualized assessment of each claimant's actual ability to safely perform the chipper job, considering a reasonable medical judgment relying on the most current medical knowledge and/or the best available objective evidence.

Instead, Amsted relied solely on the NC-Stat results and choose halt the progress of claimants through the hiring process, unless, at their own expense, they obtained an outside NCT and produced "normal" results to "prove wrong" its assumptions. FN 5, 6, 13-15, 28, 34, 35.

Amsted's placement of burden and expense on applicants to complete its own pre-employment exam and determine their medical is a facial violation of the ADA.

### III.   EEOC IS ENTITLED TO SUMMARY JUDGMENT ON AMSTED'S AFFIRMATIVE DIRECT THREAT DEFENSE.

**A.   Amsted's direct threat defense must fail as the uncontroverted facts establish that its decision to reject the claimants was not based on an individualized assessment, nor the most current medical knowledge/best available objective evidence.**

Having established that claimants are qualified individuals with a disability and that Amsted refused to hire them because of their disability, the EEOC is entitled to summary judgment absent a valid affirmative defense to liability. *Chevron U.S.A. Inc. v. Echazabel*, 536 U.S. 73 (2002). Here, Amsted contends it refused to hire claimants as chippers to avoid a "direct threat" to their health or safety. [Doc. 50, Amended Answer at p. 19, ¶ 1].[49] But the undisputed facts establish Amsted's affirmative defense is not meritorious.

"Direct threat" is defined as "a significant risk of substantial harm to the health or safety of the individual or others." 29 C.F.R. § 1630.2(r).

> The determination that [an employee] poses a direct threat must be premised upon 'a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job.' [The assessment takes into account characteristics of the harm allegedly posed]: (1) the duration of the risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm.

*Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 660 (7th Cir. 2005) (citing *Chevron,* 536 U.S. 73 and 29 C.F.R. § 1630.2(r)); *Branham v. Snow*, 392 F.3d 896, 906 (7th Cir. 2004). "Such consideration must rely on objective, factual evidence—not on subjective perceptions, irrational fears, patronizing attitudes, or stereotypes—about the nature or effect of a particular disability, or of disability generally." 29 C.F.R. § Pt. 1630, App. § 1630.2(r). Individualized assessments in 29 C.F.R. § 1630.2(r) is essential to

---

[49] Amsted bears the burden of establishing this defense. *Bodenstab v. Cty. of Cook*, 569 F.3d 651, 658 (7th Cir. 2009).

protect against the risk of paternalism the ADA was enacted to discourage. *See Chevron*, 536 US at 85-86.

"The key inquiry when considering whether an employee is a direct threat is 'not... whether a risk exists, but whether it is significant.'" *Branham*, 392 F.3d at 905-06. "An employer [cannot] deny an employment opportunity to an individual with a disability… because of a slightly increased risk. The risk can only be considered when it poses a significant risk, i.e., high probability, of substantial harm; a speculative or remote risk is insufficient." 29 C.F.R. § 1630, App. § 1630.2(r).

Finally, "[e]mployers do not escape their legal obligations under the ADA by contracting out certain … personnel functions to third parties." *Holiday v. City of Chattanooga*, 206 F.3d 637, 645 (6th Cir. 2000). For example, an employer may not rely upon the recommendation of a physician who conducts a cursory examination and bases his opinion on a general assumption that all patients with the same disability have the same limitations. *Lowe v. Ala. Power Co.*, 244 F.3d 1305, 1308-09 (11th Cir. 2001) (citing *Bragdon*, 524 U.S. at 629) (finding that a good-faith belief that a significant risk of harm exists is insufficient if not grounded in medical or other objective, scientific evidence); *see also EEOC v. Rexnord Indus., LLC*, 966 F. Supp. 2d 829, 836 (E.D. Wis. 2013).

### 1.   Amsted's "direct threat" defense fails as to all claimants.

By placing claimants with an "abnormal" NCT on "medical hold pending further data," effectively ending their opportunity for employment, Amsted violated the ADA. Specifically, it did so by failing to make a reasonable individualized medical assessment relying upon the most current medical knowledge and/or the best available objective evidence regarding their present ability to safely perform the essential functions of the chipper job.

While Amsted asserts an "abnormal" NCT elevated the claimants' risk of CTS, medical knowledge in 2011 was otherwise. FN 16-25. The most current medical knowledge available to

Amsted suggested that the NCT was ineffective and a poor predictor of future disease. FN 16-25. In 2011, Amsted's NCT had a demonstrably poor positive predictive value (PPV) and was not an accurate and reliable predictor of who will develop CTS. FN 18-20. The overwhelming majority of people with "abnormal" NCT results did not develop CTS. FN 20. It follows that if all workers with "abnormal" NCT are rejected from employment, very few cases of CTS will be prevented, but a significant number of otherwise qualified, able bodied workers will be denied employment opportunities because they are regarded as disabled. FN 16-25.

Amsted's reliance on the NC-Stat to deny claimants' employment was unsound. FN 11-35. The NCT is just a test. FN 16. It does not diagnose CTS. *Id.* Likewise, an "abnormal" result is not a symptom of CTS. *Id.* An individual can have an "abnormal" NCT and never develop CTS. FN 16-16-20, 23-25. Further, an asymptomatic individual with an "abnormal" NCT or potential "median neuropathy" is not actually impaired in any way, requires no treatment, and can perform jobs believed to be high risk for CTS. *Id.*

Moreover, since 2006, Amsted was on notice that "the NC-Stat evaluation using DML is an ineffective method of screening for or of diagnosing CTS... [and] significantly overdiagnoses CTS in an asymptomatic population of industrial workers." FN 12, 21, 22. This raises, "serious concerns about the validity of 'positive' [results]." *Id.* Notwithstanding this knowledge, Amsted continued to rely on the same NCT to deny claimants employment in 2011. *Id.*

Had Amsted conducted a proper individualized assessment of each claimant, it would be clear that the relevant factors weigh against its defense in every case. Specifically, the imminence and likelihood of risk is speculative and remote, and, based on then-current medical knowledge, unlikely to occur. FN 16-25. The potential harm, e.g. development of CTS, is non-life threatening and is readily treatable. FN 7-9. Even when a chipper developed CTS, he most often received treatment

and a transfer to a different job. FN 10. Thus, the harm of CTS was not "substantial" and the increased risk attributable to an "abnormal" NCT was not significant. 29 C.F.R. § 1630.2(r).

The objective evidence needed to make a medical determination about whether a claimant could safely perform the chipper job was available to Amsted. FN 5, 26-29. However, it chose not to obtain or use it, relying solely on NCT results. FN 11-15, 29-32. Since Amsted was looking to screen out applicants with CTS, it should have, at a minimum, in conjunction with the NCT, solicited from applicants whether they were experiencing symptoms consistent with CTS and based its determinations on that information. FN 5, 6, 11-15, 26-28. Amsted had the opportunity to question and examine claimants to ascertain if each had CTS symptoms thereby ruling in or out CTS. FN 5, 6, 26-29. This would have constituted the best available medical evidence on which to decide if each claimant could safely work as a chipper. With this information on each claimant, Amsted could have then conducted the statutory required individualized direct threat assessment for each claimant, but it did not do so. Amsted ignored alternative outside medical evidence supporting claimants' ability to work and ignored its own physical exam evidence to the contrary. FN 15, 32-35.

### 2. Amsted's "direct threat" defense fails as to Ingram.

Similarly, instead of performing an individualized assessment of Ingram to determine if he could safely perform the chipper's essential job functions, Amsted impermissibly relied on "myths and fears" about Ingram's corrective surgery for CT to "instantly" deny him the job. *See Sch. Bd. of Nassau County, Fla., v. Arline*, 480 U.S. 273, 284 (1987). Amsted's explanation for Ingram's "instant" medical disqualification was not based upon the most current medical knowledge and the best available objective evidence. FN 40-48. It was instead contingent on multiple hypotheticals and analytic leaps and defied the very scientific study upon which Amsted allegedly relied. FN 44-48. It was illegal to make wild, generalized negative inferences from that study about Ingram's risk of potential harm, i.e. permanent disability upon developing CTS and undergoing secondary CT

surgery. *Branham*, 392 F.3d at 906 ("the determination that a significant risk exists must be objectively reasonable."). Instead, Amsted simply ignored the best available objective evidence -- e.g., the fact that Ingram was asymptomatic for CTS, had a "normal" NCT; was healthy, and had no work restrictions. FN 39, 43, 47.

## IV.   <u>CONCLUSION</u>

The evidence is uncontroverted that each claimant had a disability, he was qualified for the chipper job, and Amsted rescinded its offer because of his disability. Thus, liability is established. The evidence is also uncontroverted that Amsted did not rely on the most current medical knowledge or the best available objective evidence when it concluded each claimant could not safely do the job. Thus, summary judgment on Amsted's "direct threat" affirmative defense is appropriate.

<div style="margin-left: 3in;">

Respectfully submitted,

s/ Patrick J. Holman
PATRICK J. HOLMAN
Sr Trial Attorney, OBA No.: 21216
(405) 231-4363 (telephone)
(405) 231-4375 (fax)
patrick.holman@eeoc.gov (email)

JEFF A. LEE
Sr Trial Attorney,
(405) 231-5829 (telephone)
(405) 231-4375 (fax)
Jeff.lee@eeoc.gov (email)

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Oklahoma City Area Office
215 Dean A. McGee Ave., Ste 524
Oklahoma City, OK 73102

</div>

GRANT R. DOTY
Trial Attorney,
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
 St Louis District Office
1222 Spruce Street, #8.100
St. Louis, MO 63103
314-539-7918 (telephone)
314-539-7895 (fax)
grant.doty@eeoc.gov (email)

**Attorneys for Plaintiff EEOC**


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent via the Court's e-filing system software, on this 14th day of October 2016 to the following:

Donald S. Prophete, MO Bar #56058
dprophete@constangy.com
Nikki Hininger Howell, MO Bar #56815
nhowell@constangy.com
R. Evan Jarrold, MO Bar #64936
ejarrold@constangy.com
Constangy, Brooks, Smith & Prophete, LLP
2600 Grand Blvd., Suite 750
Kansas City, MO 64108
Telephone: 816.472.6400
Facsimile:  816.472.6401

Robert L. Ortbals, Jr., MO Bar # 56540
rortbals@constangy.com
7733 Forsyth Blvd., Suite 1325
St. Louis, MO 63105
Telephone: 314.925.7270
Facsimile:  314.727.1978

**ATTORNEYS FOR DEFENDANT**

s/ Patrick J. Holman
Patrick J. Holman