**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | ) | |
| Plaintiff, | ) | |
| v. | ) | **Case No. 3:14-cv-01292-JPG-SCW** |
| **AMSTED RAIL COMPANY, INC.,** | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY OF LANE HUDGINS, PH.D. AND STRIKE SUPPLEMENTAL REPORTS AND SUPPORTING BRIEF**

Defendant Amsted Rail Company, Inc. moves to exclude the expert testimony of Lane Hudgins, Ph.D. and to strike Dr. Hudgins' Supplemental Report and Second Supplemental Report. In support, Amsted states:

**INTRODUCTION**

In this failure-to-hire action brought by EEOC on behalf of 40 claimants alleging disability discrimination under the ADA, EEOC seeks to introduce testimony from Lane Hudgins, Ph.D., a forensic economist. EEOC intends to have Dr. Hudgins testify about her calculations of alleged economic damages for the 40 claimants. Dr. Hudgins has authored one Initial Report and two Supplemental Reports opining on these issues.[1] Because of EEOC's unreasonable delay in seeking and producing information and documents pertaining to the claimants' finances and employment, however, Dr. Hudgins's Initial Report was based primarily on EEOC's own summary of economic damages rather than any objective information provided by the claimants. Days before her deposition, and after the deadline for expert reports had passed, EEOC produced Dr. Hudgins's

[1] Dr. Hudgins' Initial Report is attached as Ex. A; her Supplemental Report as Ex. B; and her Second Supplemental Report as Ex. C.

Supplemental Report, which provided substantive revisions that accounted for information gleaned from discovery and the claimants' depositions. In August 2016, Dr. Hudgins provided a Second Supplemental Report which contained additional substantial changes to both Dr. Hudgins's calculations and her methodology. These substantive revisions were made long after the expert report deadline had passed, months after the court directed EEOC to produce the financial information, and after Amsted illuminated the inadequacies in Dr. Hudgins's reports during her deposition. In sum, Dr. Hudgins's Supplement Reports are improper attempts to bolster the inadequate and incomplete opinions set forth in her Initial Report. Because Dr. Hudgins's opinions were not fully set forth by the deadline for expert disclosure, the Court should strike her Supplemental and Second Supplemental Reports.

Even if the Court does not strike the Supplemental Reports, no matter which report is considered, Dr. Hudgins's testimony is based on insufficient data, unsupported assumptions and methods, and improper summary data created by the EEOC. As a result, her testimony should be excluded for failing to satisfy the standards of Federal Rule of Evidence Rule 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

## FACTUAL BACKGROUND

In September 2015, EEOC engaged Dr. Lane Hudgins as an expert witness on economic damages. (Ex. D, Hudgins Dep., at 7:8-16.) Specifically, Dr. Hudgins was asked to estimate the projected earnings for the individual claimants and calculate their alleged back pay damages. (*Id.* at 7:17-25.) Dr. Hudgins relied on claimant wage and benefit information provided by EEOC in calculating each claimant's purported economic losses, but her calculations were not reliable because EEOC did not provide her with complete information regarding the wages or benefits earned by the claimants in other jobs. Instead, EEOC spent its time engaging in discovery disputes

with Amsted over this information which was crucial to assess the claimants' alleged damages. (Dkt. ##61, 64, 78, and 82.)

EEOC's deadline to disclose its experts was January 30, 2016. *See* Doc. 45. On February 4, 2016,[2] EEOC disclosed Dr. Lane Hudgins as an expert on economic loss and produced her report Initial Report, which provides an estimate of the economic losses allegedly suffered by each of the claimants. (Ex. A.) Throughout her Initial Report, Dr. Hudgins notes that she did not have basic underlying data to support her damages assumptions. Because Dr. Hudgins did not have complete information regarding wages or benefits earned, she assumed greater losses for many of the claimants (e.g., if she didn't have records of subsequent employment, she assumed the claimant did not work).

On February 26, 2016, the Court directed EEOC to respond to Amsted's request for past work history, sources of income, 401(k) benefits, efforts to find employment, and evidence demonstrating an inability to work. (Dkt. #61.) EEOC was obligated to comply with the Court's order by March 18, 2016. EEOC partly supplemented its responses, but its responses remained deficient. (Dkt. #82.)

On April 8, 2016, i.e., the last business day before Dr. Hudgins' deposition, EEOC produced Dr. Hudgins's Supplemental Report. (Ex. B; Ex. E.) The Supplemental Report purports to do the following: (1) update the analyses of the individual economic losses suffered by each claimant; (2) note which individuals are no longer claimants; (3) account for additional information that was not provided to Hudgins or reviewed prior to the Initial Report; and (4) adjust the back pay start dates for individual claimants based on the additional information received. (Ex. B, at 1.) Dr. Hudgins claimed that the supplement "does not change or update the methodology and

[2] This disclosure was timely per the parties' agreement.

information contained in Section II of the initial report." (*Id*.)

On May 27, 2016, the Court held a discovery dispute conference, during which it noted that EEOC's responses to Amsted's discovery requests pertaining to the claimants were "long overdue." (Dkt. #82, at 2.) The Court held another discovery dispute conference on July 5, 2016, in which it considered whether sanctions were warranted against EEOC due to the late disclosure of medical and income records for the claimants. (Dkt. #87.) The Court ruled that EEOC needed to continue to make efforts to remedy the late disclosures in order to avoid sanctions. (Dkt. #87.)

On August 15, 2016, more than six months after the expert disclosure deadline, EEOC produced Dr. Hudgins's Second Supplemental Report. (Ex. C; Ex. F.) According to Dr. Hudgins, the purpose of the Second Supplemental Report was to update the previous reports "to include all claimant information available as of July 29, 2016, and to correct errors in [her] initial calculations." (Ex. C, at 1.) The Second Supplemental Report accounts for the belatedly disclosed income records for the claimants and also includes an additional narrative section explaining the new and revised calculations contained therein. (*Id.* at 1-2.) In the narrative section, Dr. Hudgins explains that she has changed her methodology with respect to calculating damages for lost fringe benefits, seemingly in response to criticisms of her methods during her deposition. (*Id.* at 1-2.)

## ARGUMENT

### I. The Court Should Strike the Supplemental Reports Because They Are Not True Supplements.

As an initial matter, the Court should strike Dr. Hudgins's Supplemental Report and Second Supplemental Report because they do not satisfy Rules 26(a)(2) and (e). Under Rule 26(a)(2), a party is required to disclose a "complete statement of all opinions the witness will express and the basis and reasons for them" by the deadline for expert disclosure. Fed. R. Civ. P. 26(a)(2)(B)(i). Parties are also required to supplement information included in the expert report

"in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e). If a party fails to timely comply with Rule 26(e), the party is not allowed to rely on the untimely evidence at trial unless the failure was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Notably, supplemental disclosures "are not intended to provide an extension of the expert designation and report production deadline." *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 159 (S.D. Ind. 2009). Although a party is required to supplement or correct an expert report, a supplemental report is not a "license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report." *Id.* (citing *Allgood v. General Motors Corp.*, 2007 WL 647496, at *4 (S.D. Ind. 2007)). Rule 26(a)(2) is also intended to ensure that an expert has provided a detailed expert report in advance of the expert's deposition so that the opposing party is able to properly "evaluate the opinions to be offered" during the deposition. *Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*, 2006 WL 5309506, at *1 (S.D. Fla. Oct. 18, 2006). If an expert's initial report is "largely preliminary" and does not include specific calculations, the expert cannot simply "supplement" the report at a later time by expressing new opinions and providing a more detailed set of calculations. *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. at 159. Rule 26 does not give a party "a license to disregard discovery deadlines and to offer new opinions under the guise of the 'supplement' label." *Id.* Instead, where an expert only provides general conclusions in an initial report, a subsequent more detailed report should be treated as entirely new expert testimony rather than a true supplement within the meaning of Rule 26(e). *Id.* In such cases, the "supplemental" report should be stricken by the court. *Id.*

Here, as a result of EEOC's own failure to obtain reliable information from the claimants, Dr. Hudgins's Initial Report was essentially a preliminary report. As described in more detail below, Dr. Hudgins admits that she did not have sufficient information to determine whether the claimants had mitigated their damages and instead had to rely on a number of assumptions about the claimants without relying on objective evidence. (Ex. D, at 111:25-112:12). Dr. Hudgins's Supplemental Report and Second Supplemental Report added a significant amount of detailed calculations to the Initial Report, resulting in a number of substantial and material changes to her conclusions. In her Second Supplemental Report, Dr. Hudgins also changes her methodology in a number of aspects[3] seemingly to cover up inadequacies which were illuminated during her deposition. In other words, Dr. Hudgins attempted to bolster the gross inadequacies of her Initial Report through untimely and improper "supplements" which were in fact entirely new expert opinions. Although some of Dr. Hudgins's changes were due to new information produced in the case, EEOC's untimely disclosure of such information and the resulting attempts to supplement the Initial Report are neither substantially justified nor harmless. EEOC was only willing to remedy its discovery deficiencies with respect to claimant information after it was repeatedly ordered to do so by the Court. As a result of the untimely disclosures of the Second Supplemental Report, Amsted is unable to depose Dr. Hudgins about the information contained therein. Consequently, the Court should strike Dr. Hudgins's Supplemental Reports.

## II. Legal Standard for Admissibility of Expert Testimony.

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)." *Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (internal citations omitted).

[3] For example, Dr. Hudgins changes her methodology with respect to insurance and 401(k) benefits to address errors discussed during her deposition. (Ex. C, at 1-3.)

Under Federal Rule of Evidence 702, an expert witness must be qualified to testify "by knowledge, skill, experience, or education." Once a court has determined that an expert is qualified, the court will "perform the gatekeeping function of determining prior to admission whether the expert testimony is both relevant and reliable." *Sloan Valve Co. v. Zurn Indus., Inc.*, 2013 WL 4506127, at *3 (N.D. Ill. Aug. 23, 2013); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).

A qualified witness may only testify if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. In assessing the reliability of expert testimony, the court considers, for example, whether the theory has been verified by the scientific method through testing, subjected to peer review, and the general acceptance of the theory in the scientific community. *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996).

Regardless of whether the Court strikes Dr. Hudgins's Supplemental Reports, her testimony fails the *Daubert* test on several grounds, and, therefore, she should not be admitted as an expert. First, Dr. Hudgins does not have the necessary experience to be qualified as an expert witness in this matter. Second, her testimony is not based on sufficient facts or data. Finally, Dr. Hudgins did not use reliable principles and methods to calculate the claimants' estimated economic losses.

**a. Dr. Hudgins Is Not Sufficiently Qualified to Testify as an Expert.**

The first inquiry that a court must make in considering expert testimony is to determine whether the expert is qualified "by knowledge, skill, experience, or education" to testify on the

matter at hand. *Sloan Valve Co.*, 2013 WL 4506127, at *3. Dr. Hudgins does not have the specific experience necessary to testify in the present matter. Notably, Dr. Hudgins has no experience in providing testimony in failure-to-hire cases. Indeed, this is Dr. Hudgins' first failure-to-hire case. (Ex. D, at 18:4-6.) She also has almost no experience with discrimination cases in general or cases involving a large number of claimants. Her expert testimony has almost exclusively been limited to wrongful death and product liability cases. (Ex. D, at 15:1-9.) Out of approximately eighty to ninety-five cases in which Dr. Hudgins has provided expert services, this case is only her third employment case. (Ex. D, at 16:13-19.) She also does not have any experience working with a unionized workforce. (Ex. D, at 54:4-6.) Therefore, Dr. Hudgins does not pass the first test of admissibility.

**b. Dr. Hudgins's Opinions Are Based on Insufficient Facts.**

Rule 703 of the Federal Rules of Evidence requires the facts relied on by an expert to be the "type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." If, however, "the data underlying the expert's opinion is 'so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded.'" *Lyman*, at *726 (citing *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999)). Notably, "Rule 703 ' was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.'" *Id*. (citing *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005)). Accordingly, where an expert relies on summaries prepared by an attorney and does not independently verify the reliability of the underlying data, courts have regularly held that such opinions are inherently unreliable, and therefore unacceptable. *Id.*; *see also In re TMI*, 193 F.3d at 697-98; *Montgomery County v.*

*Microvote Corp.*, 320 F. 3d 440, 448-49 (3d Cir. 2003) (excluding expert testimony where expert did not know the source of the data on which he based his opinion); *Crowley v. Chait*, 322 F. Supp. 2d 530, 546-47 (D.N.J. 2004) (noting that it would be unacceptable to allow an expert to offer testimony to a jury based on the highly filtered version of events provided to, and not independently verified by, the expert).

Dr. Hudgins' reports are largely based on summary data prepared by EEOC, which cannot, as a matter of law, be the basis of reliable expert testimony. During her deposition, Hudgins admitted that she did not conduct any independent research to determine or verify the information supporting her calculations of earning figures for the individual claimants. (Ex. D, at 23:2-8.) Instead, in determining each claimant's wage and benefit information, she relied entirely on information provided to her by EEOC, which was often incomplete or unsupported.[4] (Ex. D, at 23:9-22.) For the individual claimant calculations, Dr. Hudgins initially relied on summary data prepared by EEOC, indicating each claimant's employment and earnings history for the period prior to applying for a position with Amsted Rail, and summarizing mitigating wage information, relevant back pay period, and time a claimant might have been out of work. (Ex. D, at 87:87:14-24.) In places where she was missing information about a claimant, she performed her calculations based on EEOC's representations. (Ex. D, at 89:15-90:4.)

Even when Dr. Hudgins possessed some objective information about claimants' financial circumstances, she often did not have sufficient information to determine whether claimants had mitigated their damages. (Ex. D, at 111:25-112:12) In many cases, Dr. Hudgins assumed that the

[4] Further demonstrating the unreliable nature of the data and assumptions being provided by EEOC, Dr. Hudgins' initial estimate of total liability for the claimants, based mostly on EEOC's summaries, was $11,461,112. (Ex. A, at 174.) In comparison, Dr. Hudgins' Second Supplemental Report estimates the liability to be $6,603,960. (Ex. C, at 201.) The Second Supplemental Report relies upon significantly more financial data from the claimants themselves.

claimants suffered a full loss of wages for the year at issue. (Ex. D, at 93:7-94:7; 115:4-116:21; 124:1-12; 127:9-128:10.) For example, with respect to Ashraf Abdallah, Dr. Hudgins admits that, in her Initial and Supplemental Report, she did not have any facts to make a supportable assumption about what he was doing in 2012. (Ex. D, at 96:4-8.) Dr. Hudgins also admits that in other similar instances, she just made a judgment call, not based on any underlying data and not intended to be an accurate representation of a claimant's employment history. (Ex. D, at 96:25-97:9.)

Dr. Hudgins also initially chose to rely on claimants' deposition statements rather than underlying documents such as business income and expense statements. (Ex. D, at 97:10-98:17; 119:17-120:12.) For Kevin Adams, a claimant who obtained mitigating employment with the U.S. Army, Dr. Hudgins assumed, without any basis and in contrast to Adams' deposition testimony, that he had not received any employment benefits.[5] (Ex. D, at 102:24-104:5; 109:14-18; Ex. G, Adams Dep., at 8-9, 33-37.) She also failed to properly credit claimants who obtained better-paying positions after being denied employment at Amsted. (Ex. D, at 130:17-25.)

In all of her reports, Dr. Hudgins also includes damages for "increased tax liability" for the claimants based on the assumption that they will pay more taxes by receiving a lump sum of back pay than they would have received by being employed over the back pay period. (Ex. A, at 8.) Tax liability damages, however, cannot be assessed without engaging in the "purely speculative task of determining and then offsetting the plaintiffs' future tax liability." *Garner v. G.D. Searle Pharm. & Co.*, 2013 WL 568871, at *15 (M.D. Ala. Feb. 14, 2013). Indeed, even in cases where Dr.

[5] After this flaw was discussed during Dr. Hudgins's deposition, she sought to remedy this methodology in her untimely Second Supplemental Report. Although this issue was not addressed in her previous reports, in the Second Supplemental Report, Dr. Hudgins relied on information from military pay tables and calculators to account for Adams's housing, subsistence, and clothing, allowances. This information was publicly available at the time she prepared her Initial Report.

Hudgins had W-2 forms for the claimants, many of her calculations are based on speculation about the claimants' filing status, exemptions, household income, and deductions. (*See, e.g.*, Ex. C, at 4, 32, 43, 51, 55, 61, 66, 77.) Therefore, Dr. Hudgins' tax liability calculations are not based on sufficient facts to support a reliable calculation.

**c. Dr. Hudgins Did Not Use Reliable Principles to Perform Her Calculations.**

Dr. Hudgins did not rely on accepted, reliable principles in estimating the claimants' damages. To the contrary, in many cases, Dr. Hudgins performed her calculations the way that she did merely because EEOC told her to do them that way. When questioned on the reasons for making such assumptions, Dr. Hudgins could only defend her work by saying it was the "nature of her assignment." In other words, EEOC is pulling the strings on Dr. Hudgins's testimony by providing her with its own calculations and summary data, and by directing her assumptions. In many cases, Dr. Hudgins ignored relevant facts that would have drastically changed her computations. As a result, Dr. Hudgins admitted throughout her testimony that her opinion was not meant to be accurate. (*See, e.g.*, Ex. D, at 69:11-17; 97:1-9; 104:23-105:2.)

Dr. Hudgins' chosen method for determining the amount of pay that the claimants would have received if they had been hired as Chippers is inherently flawed and unreliable. In her reports, Dr. Hudgins admits that earnings for Chippers varied greatly per employee per year, based partly on varying hourly wages, varying numbers of hours worked, and overtime. (Ex. D, at 24:16-25:1-4; 25:21-; 35:6-36:1.) Dr. Hudgins reviewed an hourly breakdown of every Chipper that had been employed by 2011, but she did not use this data to determine an average amount of hours worked per Chipper. (Ex. D, at 25:5-20.) Instead, she merely looked at average annual earnings for a sample of 44 Chippers hired in 2011, who remained employed through 2015. (Ex. D, at 27:4-20.) She did not consider the wages of the other approximately 100 Chippers hired in 2011, who did

not remain employed into 2015. (Ex. D, at 28:3-19.) She admits that this strategy yielded a higher wage than she would have calculated had she included the wages of all Chippers hired in 2011. (Ex. D, at 28:20-29:7.) Hudgins used this method because she was instructed to do so by EEOC. (Ex. D, at 29:15-23.)

Hudgins's decision to assume that all the claimants would remain employed as Chippers for the entire relevant time period was also particularly unreliable in light of the high turnout rate for Chippers at Amsted. The Seventh Circuit has cautioned that damages computations which do not address the volatility of the occupation at issue are unsound. *Price v. Marshall Erdman & Associates, Inc.*, 966 F.2d 320, 327 (7th Cir. 1992). Here, only about 35% of the Chippers hired in 2011 remained employed through 2015. (Ex. D, at 28:9-11.) Yet, Dr. Hudgins assumed that all of the claimants would remain employed through the time of trial. (Ex. D, at 30:6-23.) She admits that she could have created a projection which would have accounted for the probability of claimants leaving the Chipper job. (Ex. D, at 31:3-17; 32:6-33:6.) However, EEOC asked her to assume that the claimants would remain in their position, and so her report was based on that assumption. (Ex. D, at 33:1-22.) In essence, Dr. Hudgins repeatedly ignored reliable forensic accounting techniques in favor of following EEOC's directions.

In determining the average salaries of Chippers, Dr. Hudgins also failed to differentiate between Chippers who worked different shifts, or even Chippers who held additional positions such as Welders. (Ex. D, at 39:5-41:2.) She did not know or consider whether any of the Chippers to whom she was comparing the claimants moved into other jobs or were promoted to positions that would have resulted in a higher wage. (Ex. D, at 41:19-44:19.) She merely assumed that every Chipper hired in 2011 and still employed in 2015 should be included in the average calculations, despite the fact that 17 of the 152 Chippers hired were noted as also working other positions. (Ex.



4162800v.1

D, at 46:5-47:20.) She admits that she could have forensically accounted for the possibility that a given Chipper would be promoted or move into a higher paying position, but that she did not do so in this case. (Ex. D, at 47:21-48:9.) She also could have simply excluded those Chippers who moved into different positions from the average calculations, but she chose not to do that either. (Ex. D, at 50:19-52:23.)

Dr. Hudgins also used unreliable methods to calculate fringe benefits, and then changed some of her methodology after Amsted emphasized her errors during her deposition. At all times, Dr. Hudgins assumed that all of the claimants would elect to participate in all of Amsted's benefit plans, even though she recognized that only a portion of chippers actually make those elections. (Ex. D, at 55:1-56:24.) She notes that it was the "nature of [her] assignment" to assume that every individual would participate fully in the plans. (Ex. D, at 56:20-24.) She also did not have sufficiently reliable information to determine whether the claimants would elect single or family coverage, but she nonetheless made assumptions about what plan each claimant would select. (Ex. D, at 58:2-59:6.) Moreover, she did not deduct the portion of the premiums that claimants would have paid had they elected benefit coverage, even though this would have created a more accurate reflection of the claimants' economic condition. (Ex. D, at 68:5-10; 69:11-17.) At her deposition, Dr. Hudgins admitted that this assumption was not based on any generally-accepted principle. (Ex. D, at 68:19-24.)

In her Second Supplemental Report, which was issued months after Dr. Hudgins' deposition and close of discovery, Dr. Hudgins changed her methodology and acknowledged the importance of accounting for the "relative proportion of employer and employee contributions" in her calculations. (Ex C, at 1-2.) Thus, in the Second Supplemental Report, Dr. Hudgins accounted for employee contributions to health care premiums. (*Id.* at 2.)

Regarding 401(k) benefits, Dr. Hudgins also made numerous unreliable assumptions. She assumed that every claimant would participate, receive the full employer match, full employer 3% contribution, and vest at 100 percent, even though full vesting does not occur for five years. (Ex. D, at 73:10-15; 71:3-21; Ex. C, at 2-3.) She also initially allocated lost 401(k) employer contribution and matching to the claimants in their first year of employment despite the fact that these benefits would not have been available until the claimants' one-year anniversary. (Ex. D, at 98:22-100:10.) At her deposition, she admitted that this assumption was not based on any facts in the case. (Ex. D, at 76:15-77:4.)

In her Second Supplemental Report, however, Dr. Hudgins changed the start date of the 401(k) benefits from the claimants' start dates to the claimants' one-year anniversaries with Amsted. (Ex. C, at 2.) She also adjusted the 401(k) damages estimates by deducting any mitigating 401(k) or retirement plans offered by the claimants' subsequent employers. (*Id.* at 2-3.) Dr. Hudgins's belated changes to her methodology for calculating fringe benefit damages demonstrate that she was not utilizing reliable methods to conduct her analysis. Further, as discussed above, Dr. Hudgins cannot cure her inadequate Initial Report by offering a new "supplemental" report applying the methodologies suggested to her by Amsted in her deposition.

## CONCLUSION

For the reasons stated above, Amsted requests that the Court grant its motion, striking Dr. Hudgins' Supplemental and Second Supplemental Reports, and excluding her testimony from trial in its entirety. Such relief is warranted in this case due to Dr. Hudgins's admitted reliance on insufficient data and unsupported assumptions and methods, as well as the attempt to remedy these inadequacies through the creation of supplemental reports which do not satisfy the requirements of Rule 26.

Respectfully submitted,

CONSTANGY, BROOKS, SMITH & PROPHETE, LLP

/s/ Robert L. Ortbals, Jr.
Donald S. Prophete, MO Bar #56058
dprophete@constangy.com
Nikki Hininger Howell, MO Bar #56815
nhowell@constangy.com
R. Evan Jarrold, MO Bar #64936
ejarrold@constangy.com
2600 Grand Blvd., Suite 750
Kansas City, MO 64108
Telephone: 816.472.6400
Facsimile: 816.472.6401

Robert L. Ortbals, Jr., MO Bar #56540
rortbals@constangy.com
7733 Forsyth Blvd., Suite 1325
St. Louis, MO 63105
Telephone: 314.925.7270
Facsimile: 314.727.1978

**Attorneys for Defendant**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent via electronic mail, through the Court's e-filing system software, on this 14th day of October, 2016, to the following:

Patrick J. Holman: patrick.holman@eeoc.gov
Jeff A. Lee: jeff.lee@eeoc.gov
Grant R. Doty: grant.doty@eeoc.gov

**Attorneys for Plaintiff**

/s/ Robert L. Ortbals, Jr.
Attorney for Defendant