UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

        Plaintiff,

  v.

AMSTED RAIL CO., INC.,

        Defendant.

Case No. 14-cv-1292-JPG-SCW

## MEMORANDUM AND ORDER

This matter comes before the Court on a variety of motions in this suit under Title I and V

of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112(a), and Title I of the

Civil Rights Act of 1991, 42 U.S.C. § 1981a.   The plaintiff Equal Employment Opportunity

Commission's ("EEOC" or "Commission") contends that defendant Amsted Rail Co., Inc.

("Amsted") discriminated against Montrell Ingram and a class of other applicants ("Claimants")

for the job of "chipper" – which requires using a hammer or grinder to remove metal protrusions

from steel castings – because it regarded them as disabled by carpal tunnel syndrome ("CTS")

and/or because they had a record of CTS.   The motions addressed in this order are:

- the EEOC's motion for partial summary judgment on the issue of liability and the direct threat defense to an ADA action (Doc. 97), Amsted's response (Doc. 104), and the EEOC's reply (Doc. 112);

- Amsted's motion for summary judgment (Doc. 98), the EEOC's response (Doc. 106), and Amsted's reply (Doc. 109);

- Amsted's motion to strike parts of Ingram's declaration in support of summary judgment (Doc. 108), and the EEOC's response (Doc. 111).

## I.    Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the non-moving party carries the burden of proof at trial, the moving party may satisfy its burden of production in one of two ways. It may present evidence that negates an essential element of the non-moving party's case, *see* Fed. R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the non-moving party's case without actually submitting any evidence, *see* Fed. R. Civ. P. 56(c)(1)(B). *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169. If the moving party bears the burden of persuasion on an issue at trial, it must "lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. National Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). Where the moving party fails to meet its strict burden, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

## II. Facts

Amsted operates a facility in Granite City, Illinois. At that facility, it employs individuals

as "chippers" to remove imperfections and to finish the surfaces of the steel side frames and bolsters it manufactures for railcars. Chippers use pneumatically powered tools – including chipping hammers, two-handled disk grinders and cone grinders – and 12-pound sledgehammers to do the job. The work requires very intensive use of the hands and arms and exposure to vibrations.

In 2010 and 2011, during a hiring surge, Amsted offered employment to applicants who had the necessary skills and experience, but the offers were contingent on their passing a medical examination and other tests. The medical examination aimed, in part, to determine applicants who are at higher risk of developing CTS, one of the risks of jobs that require intensive use of the hands and exposure to vibrations.[1]

A.     Use of Nerve Conduction Test Results

Amsted contracted with Midwest Occupational Medicine ("Midwest"), owned by George Dirkers, M.D., to conduct on-site medical exams, which included a medical history questionnaire, measuring vital signs, vision and hearing assessments, a physical examination, and a nerve conduction test ("NCT"). The NCT measured the conductivity of the median nerve[2] using a

---

[1] CTS "is a condition that causes numbness, tingling and other symptoms in the hand and arm. Carpal tunnel syndrome is caused by a compressed nerve in the carpal tunnel, a narrow passageway on the palm side of your wrist." Mayo Clinic, Carpal tunnel syndrome, Overview, http://www.mayoclinic.org/diseases-conditions/carpal-tunnel-syndrome/home/ovc-20313865 (visited Sept. 15, 2017). This definition is consistent with the more technical definition provided by the EEOC's expert, Alfred Franzblau, M.D., and essentially undisputed by Amsted: "a physiological condition that concerns entrapment of the median nerve at the wrist and affects and impairs the body's nervous and musculoskeletal systems; above all else, CTS is a clinical syndrome, meaning that it is defined and characterized in part by the presence of physical symptoms such as weakness, numbness, tingling, muscle dysfunction, and pain in the arm and hands." EEOC's Mot. Summ. J., Ex. 15, Franzblau Decl. ¶ 2 (Doc. 97-15).

[2] "The median nerve runs from your forearm through a passageway in your wrist (carpal tunnel) to your hand. It provides sensation to the palm side of your thumb and fingers, except the little finger. It also provides nerve signals to move the muscles around the base of your thumb (motor function)." Mayo Clinic, Carpal tunnel syndrome, Symptoms and causes,

NeuroMetrix NC-Stat device ("NC-Stat"). On Dr. Dirkers' suggestion and after discussions with him and Richard T. Katz, M.D. in 2003 Amsted approved using the NCT to identify applicants for the chipper position who were predisposed to developing CTS, although Amsted did not review the medical literature Dr. Dirkers relied on to recommend using the test for that purpose. Amsted was concerned over the number of workers compensation claims by chippers. After those discussions, Amsted purchased the NC-Stat machine for Midwest to use.

In its examinations of chipper applicants, Midwest did not have a standard practice to ask applicants about current CTS symptoms and did not perform other tests used to help diagnose CTS. Applicants whose NCT was "abnormal" were put on "medical hold pending further data" regardless of any other information obtained in the examination and were not employed at that time. This was done because Dr. Dirkers believed if a the median nerve was abnormal – was a "sick median nerve" – the individual tested was "right around the corner from" and "right on the verge of" developing CTS and losing the use of his hand. Amsted's Mem. Supp. Mot. Summ. J., Ex. 11, Dirkers Dep. 57:13-18 (Doc. 99-12). He believed that 90% of those with a "sick median nerve" would develop CTS and that those with abnormal NCT results "probably already have [CTS]," although he did not have an estimate of the percentage of people applying to be chippers with abnormal NCT results would actually develop CTS. *Id.* at 124: 21-24; *id.* at 125: 17-19. He believed these workers could perform the essential functions of the chipper job but could not do so safely because of their abnormal NCT results. Amsted was aware that applicants were being placed on hold because of an abnormal NCT result and authorized this use of the NCT results.

Midwest conducted no further testing on the applicants on hold to definitively determine whether they had CTS. Instead, it would remove the hold only after the applicant was able to

http://www.mayoclinic.org/diseases-conditions/carpal-tunnel-syndrome/symptoms-causes/dxc-2 0313870 (visited Sept. 15, 2017).

obtain, at the applicant's own expense, a "formal, in-depth" NCT that yielded a "normal" result. An NCT is estimated to costs $600-$880 if not covered by health insurance. Amsted has hired applicants who have returned with a normal NCT result.

Applicants who did not return with further medical information were not hired. Applicants who returned with further medical information but without a normal NCT result were not hired even if that further medical information showed that they did not have CTS and/or that a doctor had medically cleared them for work. Some applicants who returned with further medical information were placed by Dr. Dirkers on medical restrictions that were incompatible with chipper duties, so they were not hired. The upshot was that Amsted did not hire any applicants who did not test normal on an NCT regardless of their actual capability of performing the chipper job.

During the relevant period, Amsted made conditional job offers to thirty-nine applicants – the Claimants – but placed them on medical hold because of an abnormal NCT result. Amsted believed the Claimants could have performed the job of chipper, but could not have done so safely.

Specifically, twenty-five Claimants (Abdallah, Adams, Allen, Arnold, Bates, Brown, Cashen, Dougherty, Gean, Harmon, Harvey, Henderson, Johnson, W. Lee, Marquardt, McCartney, McKellar, Patt, Rives, Sanders, Snelson, Spring, Tarran, Welch and White) did not provide any further medical information to Amsted. Brown was diagnosed with CTS after Amsted placed him on medical hold and had corrective surgery.

Fourteen Claimants (Cade, Gibson, Gilbert, Holmes, Humphrey, Jimmerson, A. Lee, Luster, Manning, Munoz, Offerman, Robinson, Rommerskirchen and Stuckey) returned to Amsted with additional medical information, but none of that information included a normal NCT

result.[3]   Amsted placed medical restrictions on eight of those returning Claimants (Cade, Gibson, Gilbert, Humphrey, A. Lee, Munoz, Rommerskirchen and Stuckey) that were incompatible with chipper duties.   Five of those returning Claimants (Jimmerson, Holmes, Luster, Manning and Robinson) presented medical information indicating they did not have CTS, but Amsted did not release its medical hold.   Offerman was diagnosed with CTS after Amsted placed him on medical hold.   He had corrective surgery, but Amsted did not hire him.

Amsted discontinued using NCT for pre-employment screening in June 2012.

The significance of the results of the NCT performed by the NC-Stat is key.   All parties' experts generally agree on some fundamental principles:

- An abnormal NCT obtained with the NC-Stat is not proof that an individual has CTS and indicates only a "sick median nerve";

- An abnormal NCT result does not indicate an individual is incapable of performing the chipper job at that time as long as he is not experiencing CTS symptoms;

- Applicants with an abnormal NCT are at a higher risk of developing CTS than applicants with a normal NCT result; and

- The NCT performed by the NC-Stat is a poor predictor of who will develop CTS, and most of those with abnormal NCT results and no symptoms will not develop CTS.

Amsted contends that the higher risk of CTS to those with abnormal NCT results – about three to four times higher than those with normal results –is sufficient justification for not hiring those applicants.   It claims that it used the NCT to ensure workers it hired could perform their jobs safely.   The EEOC, on the other hand, contends that because an NCT has poor positive predictive value ("PPV") – less than 20% – rejecting all applicants with an abnormal NCT result excludes too many applicants.   It points to a 2004 study by its expert Alfred Franzblau, M.D., showing less

---

[3] Some of these Claimants were placed on medical hold for other reasons as well, but those concerns were eventually resolved, leaving the abnormal NCT result as the only reason for their medical holds.

than a 4% PPV, that is, less than 4% of those with abnormal NCT results developed CTS. Therefore, the EEOC argues, an abnormal NCT result is an inappropriate basis for making employment decisions.   The EEOC believes Amsted was not concerned with worker safety but with reducing workers' compensation costs.

B.   Use of CTS History

In 2010, Montrell Ingram applied to be a chipper and was offered the position contingent upon his passing the medical exam.   Ingram's NCT result was normal.   However, he had been diagnosed with CTS in 2006, had undergone surgery to relieve it, and had been released to return to work without restrictions in March 2007.   At the time of his application to Amsted, Ingram was physically able to work as a chipper and had no symptoms of CTS.   Nevertheless, Dr. Dirkers deemed him medically disqualified based on his prior CTS surgery.   Dr. Dirkers believed that because Ingram had developed CTS in the past, he was more likely to develop it again, and that if he needed a second CTS surgery, he had a 72% chance of losing the use of his hands and becoming totally disabled.   Because Dr. Dirkers found Ingram medically disqualified, Amsted did not hire him.   Amsted also refused to hire Offerman following his CTS diagnosis and corrective surgery.

C.   The Litigation

In this suit, the EEOC alleges Amsted violated Title I of the ADA, 42 U.S.C. § 12112(a), when it denied Ingram and the Claimants employment on the basis of their disability rather than an individualized assessment, considering the most current medical knowledge at the time and the best available objective evidence, of whether they could safely perform the chipper job.[4]

_____

[4] In the First Amended Complaint, the EEOC also cites the portions of the ADA requiring reasonable accommodation of a disability, 42 U.S.C. § 12112(b)(5)(A), and prohibiting retaliation, 42 U.S.C. § 12203(a).   Amsted asks the Court for summary judgment on these claims, and the EEOC has not responded to that request.   The Court notes that there are no factual allegations or evidentiary submissions from which a reasonable jury could find in the EEOC's favor on either claim and, accordingly, construes the EEOC's failure to respond to these parts of

Specifically, it argues that Ingram and the Claimants were disabled not because they were actually impaired but because they had a record of such an impairment – Ingram's past CTS diagnoses and treatment – or because Amsted regarded them as having an impairment – based on the Claimants' abnormal NCT results. *See* 42 U.S.C. § 12102(1)(B), (C). It claims that Amsted discriminated against Ingram and the Claimants on the basis of this disability in regard to job application procedures and hiring.

Both parties ask the Court now for summary judgment. The Court will describe their arguments as appropriate in its legal analysis.

## III. Analysis

The ADA provides, in pertinent part, that an employer shall not "discriminate against a qualified individual on the basis of disability in regard to job application procedures [and] the hiring . . . of employees." 42 U.S.C. § 12112(a). It further describes discrimination to include "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee." 42 U.S.C. § 12112(b)(1). "'[B]oth the letter and the spirit' of the ADA require an individualized assessment of each plaintiff's 'actual condition,' rather than a 'determination based on general information about how an uncorrected impairment usually affects individuals.'" *Branham v. Snow*, 392 F.3d 896, 902-03 (7th Cir. 2004) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483-84 (1999)). "An individualized inquiry into each plaintiff's condition remains the rule in cases under . . . the ADA." *Branham*, 392 F.3d at 903.

---

Amsted's summary judgment motion as an admission of their merits. Summary judgment will be granted for Amsted on the EEOC's failure to accommodate and retaliation claims. The Court makes on comment on any prohibited medical examination claim under 42 U.S.C. § 12112(d) as the EEOC did not plead such a claim in its complaint. Consequently, cases like *O'Neal v. City of New Albany*, 293 F.3d 998 (7th Cir. 2002), a medical examination case cited by Amsted, are not relevant to this case.

To prove an ADA claim for disparate treatment in violation of 42 U.S.C. §§ 12112(a) and (b)(1), a plaintiff must show:  "(1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by his disability."  *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016). Where there is a question whether an applicant poses a direct threat to himself or others as a consequence of his disability, in some cases it is part of the plaintiff's burden to show he is qualified because he does not pose such a threat, *Palmer v. Circuit Ct. of Cook Cnty.*, 117 F.3d 351, 352 (7th Cir. 1997), but in other cases it is the employer's burden to prove as an affirmative defense that its action was proper because the applicant posed a direct threat, *Branham*, 392 F.3d at 906.  *See Felix v. Wisconsin Dep't of Transp.*, 828 F.3d 560, 571 (7th Cir. 2016) ("[W]hen an employee's disability has actually resulted in conduct that is intolerable in the workplace, the direct-threat defense does not apply:  the case is no longer about potential but rather actual dangers that an employee's disability poses to herself and others.").

Amsted challenges the EEOC's ability to prove all elements of its case, including that the Claimants were qualified because they did not pose a direct threat.  The EEOC contends it not only can prove all elements, but that no reasonable jury could find it has not, and that Amsted is unable to prove the direct threat affirmative defense.

A.     Disabled

The ADA defines "disability" as (a) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment. 42 U.S.C. § 12102(2).  Courts should construe this definition of disability "in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter."  42 U.S.C. § 12102(4)(A).

Indeed, the 2008 ADA Amendments Act ("ADAAA"), Pub. L. 110-325, 122 Stat. 3553 (2008), aimed "to make it easier for people with disabilities to obtain protection under the ADA," and shift the focus of ADA litigation to "whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." 29 C.F.R. § 1630.1(c)(4). Each applicant is entitled to an individualized assessment of his particular circumstances rather than an assessment based on how a specific impairment *usually* affects those who have it. *Branham v. Snow,* 392 F.3d 896, 902-03 (7th Cir. 2004).

With the exception of Ingram, Amsted does not challenge whether the EEOC has sufficient evidence to prove the Claimants were disabled under the "regarded as" prong. With respect to Ingram, Amsted contends it did not regard him as having any impairment because, in light of his normal NCT, it viewed him as capable of performing the chipper job. It further contends that Ingram did not have a record of disability because there is no evidence that his prior CTS substantially limited a major life activity.

The EEOC contends that Amsted regarded Ingram as disabled because it believed that he might, at some future time, develop an actual impairment that would render him incapable of performing the chipper job. It further contends Ingram's record of CTS and CTS corrective surgery meant he had a record of disability.

1. Regarded As Disabled

This prong of the definition of disability is designed to "cover individuals rejected from a job because of the myths, fears and stereotypes associated with disabilities." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001) (internal quotations omitted); *see* 29 C.F.R. pt. 1630, App. § 1630.2(l).2 (2016) (noting Congress's intent in the ADA to prohibit discrimination based on "unfounded concerns, mistaken beliefs, fears, myths, or prejudice about disabilities"). "An

individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*." 42 U.S.C. § 12102(3)(A) (emphasis added). As the emphasized language suggests, showing that an individual is regarded as disabled "does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment." 29 C.F.R. § 1630.2(g)(3) (2012). Indeed, it is enough under the "regarded as" prong to show that an employer failed to hire an applicant because it believed, rightly or wrongly, that he would be a safety risk. *See* 29 C.F.R. pt. 1630, App. § 1630.2(l) (2016) ("[A]n employer who terminates an employee with angina from a manufacturing job that requires the employee to work around machinery, believing that the employee will pose a safety risk to himself or others if he were suddenly to lose consciousness, has regarded the individual as disabled."); *see EEOC v. Staffmark Inv. LLC*, 67 F. Supp. 3d 885, 895 (N.D. Ill. 2014). Whether the applicant was actually a safety risk is a separate inquiry to be determined in the context of the qualification inquiry or the direct threat defense. *See* 29 C.F.R. pt. 1630, App. § 1630.2(l) (2016).

In keeping with the broad view of disability embodied in the ADAAA, the Court finds there is sufficient evidence from which a reasonable jury could find Amsted regarded Ingram as disabled and, in fact, no reasonable jury could find otherwise. It is true, as Amsted contends, that it believed Ingram was unimpaired at the time it failed to hire him for the chipper job. However, it is also true it believed that, because of his history of CTS and condition following CTS corrective surgery, Ingram might at some future time develop CTS again and become unable to do the chipper job. As Judge Wood noted in dicta in her dissent in *EEOC v. Rockwell International Corp.*, 243 F.3d 1012 (7th Cir. 2001), "This smacks of exactly the kind of speculation and

stereotyping that the statute was designed to combat." *Id.* at 1019.

A word about *Rockwell* here is warranted, as Amsted cites it in support of the general proposition that it is lawful under the ADA to use abnormal NCT results to reject job applicants. *Rockwell* involved the same post-offer, pre-employment NCT results at issue in this case. That case, decided before the 2008 ADAAA, found that the defendant's use of post-offer, pre-employment NCT results to identify and exclude applicants susceptible to CTS complied with the ADA. *Id.* at 1014. However, that decision did not necessarily condone the use of NCTs to determine eligibility for employment. Instead, the case turned on whether the plaintiffs were able to produce evidence that they were disabled. Specifically, they claimed that they were disabled because the defendants regarded them as having, or being at risk of having, a condition – CTS – that impaired them generally from the major life activity of working, yet they produced no vocational testimony that they were substantially restricted from a broad range or an entire class of jobs, which at that time was required to prove impairment from the major life activity of working. *Id.* at 1017-18. However, after *Rockwell*, the ADAAA expanded the definition of disability, rendering *Rockwell*'s holding of little precedential value.

Because Amsted has conceded it refused to hire Ingram because it feared he posed a safety risk in light of his prior CTS diagnosis and corrective surgery, no reasonable jury could fail to find it regarded him as disabled. The EEOC has therefore conclusively established that Ingram is disabled, and it is entitled to summary judgment on this fact. *See* Fed. R. Civ. P. 56(g). Whether Ingram posed a safety risk will be addressed later, if necessary, in the discussion of his qualifications or the direct threat defense.

2. Record of Disability

Because the Court has determined that there is no genuine issue of material fact that Ingram

was disabled because Amsted regarded him as disabled, it need not consider whether a reasonable jury could find Ingram also had a record of disability. Further, Amsted has moved to strike part of Ingram's declaration (Doc. 108), which was offered in support of the EEOC's argument that he has a record of disability. Because the Court does not address the "record of disability" question, it will find Amsted's motion to strike moot.

### B. Qualified

Under the ADA, an individual is qualified if he, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Courts ask two questions to determine if an individual is qualified: (1) Does the person satisfy the prerequisites for the job (*e.g.*, educational background, employment experience, skills, or licenses)? and (2) Can the individual perform the essential functions of the job with or without accommodation? *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 417 (7th Cir. 2016). In this case, Amsted does not contend the Claimants failed to satisfy the first question; in fact, it made contingent job offers to the Claimants for the position of chipper *because* they satisfied the prerequisites for the job. It made those offers contingent, however, because it was not certain of the second question, whether they could perform the essential functions of the job where those functions involved intensive use of the hands and arms and exposure to vibrations.

"To determine whether a disabled person is qualified, this court considers whether he can perform the essential functions of his job at the time the employer makes the allegedly discriminatory employment decision." *Ammons v. Aramark Uniform Servs.*, 368 F.3d 809, 818 (7th Cir. 2004). "Her ability to come to work, or to otherwise perform the essential functions of her job, is examined as of the time of the adverse employment decision at issue." *Basden v.*

13

*Professional Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013).   Whether an individual is qualified for a job must be based on "an individualized assessment of the individual and the relevant position," *Weigel v. Target Stores*, 122 F.3d 461, 466 (7th Cir. 1997), rather than generalizations and assumptions.   The determination also "should not be based on speculation that the employee may become unable in the future or may cause increased health insurance premiums or workers compensation costs."   29 C.F.R. Pt. 1630, App. § 1630.2(m) (2010).

As a preliminary matter, the Court declines to consider the question of safety or direct threat in connection with the qualification analysis, instead reserving that question for its analysis of the direct threat affirmative defense.   As noted earlier, sometimes whether an individual poses a direct threat to himself or others could render him unqualified for the job.   *See Felix v. Wisconsin Dep't of Transp.*, 828 F.3d 560 (7th Cir. 2016); *Palmer v. Circuit Ct. of Cook Cnty.*, 117 F.3d 351 (7th Cir. 1997).   This has been recognized, however, when an individual's disability leads to a behavior that is unacceptable and would justify an adverse employment action toward any individual regardless of disability.   For example, in *Palmer*, a social service case worker with a mental illness threatened a coworker and a supervisor with violence.   *Palmer*, 117 F.3d at 352. The threats of violence were attributable to the mental illness, but the Court of Appeals found that, despite that disability, threatening other employees renders one unqualified for the job.   *Id.*

More recently in *Felix* the Court of Appeals distinguished conduct that renders one unqualified from potential future threats to workplace safety.   There, a department of motor vehicle employee with an anxiety disorder had a panic attack at work and was found in a public area "lying on her side, clutching her cell phone, and crying out," "had marks, scratches, and cuts on her right wrist, some of which were bleeding slightly" and "rolled onto her back and began kicking her legs."   *Felix*, 828 F.3d at 563-64.   The Court of Appeals found that the employee's

conduct was "intolerable in the workplace," raising the question whether her behavior was a legitimate, non-discriminatory reason for firing her because she posed an actual, present danger to herself and others in the workplace. *Id.* at 571. It did not involve the forward looking question of the direct threat affirmative defense of whether she posed a prospective, future danger. *Id.*

The Court of Appeals considered the qualification requirement in *Koshinski v. Decatur Foundry, Inc.*, 177 F.3d 599 (7th Cir. 1999), a case more factually similar to the case at bar. In that case, the plaintiff, a foundry worker with a physically taxing job, experienced serious wrist pain and was diagnosed with degenerative osteoarthritis that all involved agreed would eventually render him unable to do physical labor. *Id.* at 601-02. He was, however, physically able, with great pain, to do the job at the time the foundry let him go, although his and the foundry's doctors all said he should not do the types of tasks he would have to do in that job. *Id.* at 602. The Court of Appeals found that no reasonable jury could find the worker qualified in light of his current diagnosis and imminent harm he would suffer if he continued to work at the foundry. *Id.* at 603.

In sum, the foregoing cases establish that the qualification question focuses on the individual's condition at the time of the defendant's employment decision, regardless of what may happen to the individual in the future. That being said, there is no genuine issue of material fact regarding whether Ingram and the Claimants were qualified to be chippers *at the time of their applications*. The evidence shows the Claimants passed all the tests Amsted put them through except the NCT, but Amsted admits that the NCT does not indicate an individual's contemporaneous inability to perform the chipper job but only a prospective, future threat to his health if he were to perform the job. Even Dr. Dirkers' restrictions, the only medical restrictions placed on any of the applicants, were imposed based on his perception of a future threat, not a present inability to do the chipper job. His restrictions were also based on a generalized

assumption about an abnormal NCT result rather than "an individualized assessment of the individual and the relevant position," as required under the ADA. *Weigel*, 122 F.3d at 466. Consequently, a reasonable jury could only find that a normal NCT result was not a legitimate qualification standard and that the failure to pass the NCT test did not render an applicant disqualified from the chipper job. Additionally, the fact that Amsted did not perform all the testing necessary to definitively determine whether the Claimants had CTS, a condition arguably similar to the condition at issue in *Koshinski*, shows that being CTS-free was not a qualification for the job.

This conclusion holds true even for the two Claimants – Brown and Offerman – who may have had CTS at the time of their applications, passed all the tests except the NCT and were therefore qualified under Amsted's own relevant standards. The fact that, fortuitous for Amsted, they might have had CTS at the time of their application and might have been incapable of performing the job safely will not relieve Amsted of its burden of conducting an individualized assessment of their qualifications at the time of their applications. Any actual incapacity to perform the job at the time of application will be reflected in any damage calculation a jury might award. [5]

This conclusion does not hold true for the two Claimants – Cashen and Welch – who later represented to the Social Security Administration ("SSA") that they were too disabled to work since long before they applied to Amsted. The Supreme Court has held that claims of disability to

---

[5] This approach threatens to run afoul of the notion that it is the plaintiff's burden in an ADA case to prove he was qualified for the job. However, to require an applicant to prove in litigation that he was qualified by showing something more than the employer reasonably demanded in its hiring evaluation at the time of the application would effectively relieve the burden of the employer to conduct an individualized assessment and place the burden on the applicant, contrary to the intent of the ADA. Here, to determine the qualifications for the chipper job, the Court looks to Amsted's demands, at the time of the employment decision, regarding the current abilities of its applicants, which are not reflected in an NCT result that speaks only to potential future abilities.

the SSA and claims of qualification under the ADA "do not inherently conflict to the point where courts should apply a special negative presumption" that a Social Security claimant is not qualified under the ADA. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 802 (1999). The Court noted that "there are too many situations in which [a Social Security disability] claim and an ADA claim can comfortably exist side by side," so judicial estoppel should not be applied automatically based on representations to the SSA. *Id.* at 802-03. However, sworn statements of an inability to work can, if unexplained, negate an ADA claim if they conflict with the element of being qualified. *Id.* at 806. Cashen and Welch declared under penalty of perjury in applications for Social Security benefits that they had been disabled since 2008 and 2009, respectively. They were both awarded benefits. The EEOC has not offered a satisfactory explanation for these Claimants' apparently contradictory positions, so the Court takes the Claimants at their word that they were unable to work at the time they applied at Amsted. Amsted is entitled to summary judgment on the claims of Cashen and Welch.

Ingram is also entitled to summary judgment on this issue. The evidence shows Ingram did not have CTS, suffered no symptoms, had a normal NCT, was not restricted by his own doctors, and was physically capable of performing the chipper job when he was placed on medical hold. The only evidence that might suggest otherwise is Dr. Dirkers' restrictions, but, as noted above, he bases those restrictions on his belief that *in the future* Ingram may pose a danger to himself without any individualized assessment. No reasonable jury could find that Dr. Dirkers' speculation about Ingram's future safety speaks to his current ability to do the job absent CTS or any symptoms. The EEOC is therefore entitled to summary judgment on this fact. Whether Ingram actually posed a direct threat to his own safety in the future will be addressed in the context of the direct threat defense.

C.    Adverse Employment Action

The Seventh Circuit Court of Appeals defines the concept of adverse employment action quite broadly under the ADA.  *Tyler v. Ispat Inland Inc.*, 245 F.3d 969, 972 (7th Cir. 2001); *Rehling v. City of Chi.*, 207 F.3d 1009, 1018 n. 6 (7th Cir. 2000) (citing *Silk v. City of Chi.*, 194 F.3d 788, 800 (7th Cir.1999)).   In the context of discrimination against someone who is already an employee, it has required that the action "cause an adverse change in the terms and conditions of employment that is more disruptive than a mere inconvenience or alteration of job responsibilities."  *Tyler*, 245 F.3d at 972.   The Court believes that the equivalent test in the context of a job applicant would include subjecting the applicant to job application procedures that effectively foreclose an employment opportunity because of a disability.

Amsted argues that the Claimants were not subject to an adverse employment action because they were not rejected for employment but were simply put on medical hold pending receipt of further medical information – a formal, in-depth NCT that many applicants did not provide.   It notes employers are allowed to condition offers of employment on passing a medical examination.   Amsted argues that the failure of the Claimants to move along in the employment process was because of their failure to obtain the additional NCT as required by the hiring process rather than any discriminatory decision by Amsted not to hire them.

The EEOC argues that Amsted's placement of Claimants on medical hold was an adverse employment action because it effectively foreclosed future employment as a chipper.   It notes that the placement on hold occurred after Amsted had completed the all of the medical tests to which it subjected the Claimants – in essence, after Amsted has completed its application process with the Claimants' full cooperation.   It distinguishes the cases cited by Amsted in which applicants refused to submit to exams or to provide available medical information requested by the employer.

It also points to Amsted representatives' instructions to Claimants to obtain their own NCTs to "prove [Amsted] wrong" or to obtain reconsideration of Amsted's decision, suggesting the medical hold was a final decision that it was the claimant's burden to overturn.    Amsted's Mem. Supp. Mot. Summ. J., Ex. 11, Dirkers Dep. 42:4-6 (Doc. 99-12).

The evidence shows that the Claimants' placement on medical hold due to an abnormal NCT result was an adverse employment action because it effectively precluded them from being hired.[6]   Amsted completed all the tests it wanted to perform on the Claimants and obtained all the available medical records it wanted, yet it was unwilling to hire the Claimants based on the information obtained in that process.   It is true that it could have asked the Claimants to submit to further testing it wanted to perform or to provide more medical records, \see, e.g., EEOC v. Am. Tool & Mold, Inc., 21 F. Supp. 3d 1268, 1286 (M.D. Fla. 2014), but that is not what it did. Instead, it asked the Claimants, to obtain further expensive testing on their own in violation of Illinois law, 820 ILCS 235/1 ("No employer shall require any employee or applicant for employment to pay the cost of a medical examination or the cost of furnishing any records of such examination required by the employer as a condition of employment.").   Furthermore, those additional NCT requested would not have indicated a claimant's current ability to perform the chipper job.   The demand for an additional, expensive, unenlightening, in-depth NCT at the applicant's expense – and in violation of state law – was simply a sham to prevent Amsted from having to admit that its reason for refusing to hire an applicant was an abnormal NCT result and its general, but scientifically unsupported belief (discussed below in connection with the direct threat defense), about the significance of that result.   For this reason, the EEOC is entitled to summary judgment on the issue of whether Ingram and the Claimants were subject to an adverse

_____

[6] There is no genuine issue of material fact that Ingram suffered an adverse employment action when he was not hired.

employment action.

D.    Causation

An ADA plaintiff must show but-for causation in order to prevail.   *Hillmann v. City of Chi.*, 834 F.3d 787, 795 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 2117 (2017).   That means the EEOC must show here that Amsted would not have effectively removed the Claimants from the applicant pool but for their perceived disability.

Amsted argues that the EEOC cannot establish a discriminatory intent, that is, that it discriminated against the Claimants because of their disability.   It claims it relied in good faith on Dr. Dirkers' medical judgment that the Claimants were unable to safely perform the essential functions of the chipper job or had certain medical restrictions and that its human resources department did not even know the reasons Dr. Dirkers placed any applicant on medical hold.   It contends its good faith reliance on a medical opinion precludes a finding of discriminatory motive. Additionally, it argues its decision was not based on any disability but on the Claimants' failure to complete the application process by obtaining and submitting the additional information requested – a normal NCT result.

The EEOC argues that Amsted is only entitled to rely on the judgment of a medical professional to make an employment decision when that judgment is reasonable and in good faith. It cannot escape liability by blindly deferring to a third party and then relying on that third party without satisfying itself that the third party's decisions are reasonable and comply with the law. Additionally, it argues that Amsted's application process was completed once it performed its last test, and the Claimants submitted to all tests requested by Amsted, so there was no failure to complete the application process.

The Court first turns to Amsted's position that it relied in good faith on Dr. Dirkers'

medical judgment to place Ingram and the Claimants on medical hold or to impose medical restriction to argue it had no discriminatory intent. It is true that, generally, an employer is entitled to rely on a medical opinion about whether an applicant can perform the essential functions of a job. *See Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 294 (7th Cir. 2015) (citing *Timmons v. GMC,* 469 F.3d 1122, 1129 (7th Cir. 2006)). In both *Stern* and *Timmons*, the medical opinion was reached after a doctor performed an individualized examination of the employee. *Stern*, 788 F.3d at 282; *Timmons*, 469 F.3d at 1124-25. However, the employer cannot simply farm the decision-making function out to a doctor and then argue it is absolved of liability for the doctor's decision. *See Holiday v. City of Chattanooga*, 206 F.3d 637, 645 (6th Cir. 2000). The reliance on the medical opinion must be reasonable, in good faith, and not the product of collusion to disqualify an applicant. *See Bay v. Cassens Transp. Co.*, 212 F.3d 969, 975 (7th Cir. 2000). Therefore, where a doctor's medical opinion is "unsubstantiated and cursory" and "neither based on the individualized inquiry mandated by the ADA nor supported by objective scientific and medical evidence," an employer cannot rely on it to make employment decisions. *Holiday*, 206 F.3d at 645 (citing *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998) (noting that a doctor must assess risk based on objective, scientific information, not unfounded subjective beliefs, even if those subjective beliefs are in good faith)); *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 484 (5th Cir. 2006) (employer cannot defer to physician's opinion without assessing reasonableness of the physician's conclusions).

In this case, it is clear that, because of Dr. Dirkers' broad power to place applicants on medical hold or on restrictions without the involvement of Amsted personnel, Dr. Dirkers was the key decision-maker for Amsted, which then blindly accepted his medical holds and restrictions to refuse employment without further inquiry. The evidence shows Dr. Dirkers rendered his

assessments based on his general belief about the significance of an abnormal NCT result (discussed later in connection with the direct threat defense) rather than an individualized assessment of each applicant's actual abilities at the time to perform the chipper job. He issued the medical holds and restrictions that effectively removed Ingram and the Claimants from the hiring pool based on their disability. He would not have done this unless he perceived them to be disabled. Thus, disability was a "but for" cause of the failure to hire Ingram and the Claimants.

No reasonable jury could find the Claimants' failure to complete the medical exam was the reason Amsted effectively removed the Claimants from the applicant pool. As noted above, each claimant submitted to every test Amsted wanted to perform on him, and there is no indication any claimant failed to produce any available medical records. Since there was nothing more Amsted wanted to do to complete the hiring process and no more available medical records it wanted to consider, it is clear Amsted did not fail to hire the employees because they did not complete the medical examination. Instead, Amsted took the Claimants out of the applicant pool because of its perception that they were disabled.

E.      Direct Threat Affirmative Defense

Even if the EEOC establishes all the elements of an ADA disparate treatment claim, Amsted may still prevail if it can prove Ingram and the Claimants were denied employment because they posed a "direct threat." *Felix v. Wisconsin Dep't of Transp.*, 828 F.3d 560, 569 (7th Cir. 2016) (citing *Branham v. Snow,* 392 F.3d 896, 906 (7th Cir. 2004)); 42 U.S.C. § 12113(b). "Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r) (2010). The EEOC asks for summary judgment because it believes Amsted lacks the evidence to establish the direct threat affirmative defense.

The direct threat defense "requires an individualized assessment, based on reasonable medical judgment, of an employee's present ability to safely perform the essential functions of his job." *Felix v. Wis. Dept. of Transp.*, 828 F.3d 560, 569 (7th Cir. 2016) (citing 29 C.F.R. § 1630.2(r)). The "reasonable medical judgment" must rely "on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (internal quotations omitted). The factors to be considered in determining whether an individual is a direct threat include:

(1) The duration of the risk posed by the employee's condition;
(2) The nature and severity of the potential harm that might result;
(3) The likelihood that the potential harm will occur; and
(4) The imminence of the potential harm.

*Felix v. Wisconsin Dep't of Transp.*, 828 F.3d 560, 569 (7th Cir. 2016). "Such consideration must rely on objective, factual evidence – not on subjective perceptions, irrational fears, patronizing attitudes, or stereotypes – about the nature or effect of a particular disability, or of disability generally." 29 C.F.R. Pt. 1630, App. § 1630.2(r).

"The key inquiry when considering whether an employee is a direct threat is 'not . . . whether a risk exists, but whether it is significant.'" *Branham v. Snow*, 392 F.3d 896, 906 (7th Cir. 2004) (quoting *Bragdon,* 524 U.S. at 649). "An employer . . . is not permitted to deny an employment opportunity to an individual with a disability merely because of a slightly increased risk. The risk can only be considered when it poses a significant risk, i.e., high probability, of substantial harm; a speculative or remote risk is insufficient." 29 C.F.R. Pt. 1630, App. § 1630.2(r). "If performing the particular functions of a job would result in a high probability of substantial harm to the individual, the employer could reject or discharge the individual unless a reasonable accommodation that would not cause an undue hardship would avert the harm." *Id.*

As a preliminary matter, the Court addresses Amsted's argument that the direct threat defense only applies to disparate impact claims, which the EEOC has not brought, and not to disparate treatment claims. In support of its argument, Amsted notes that the ADA expressly mentions a direct threat in the context of describing a cause of action based on a qualification standard that screens out or tends to screen out disabled individuals. *See* 42 U.S.C. § 12113(a) and (b). This argument is belied by the fact that the Court of Appeals for the Seventh Circuit considers the direct threat defense in the context of disparate treatment claims, placing the burden on the defendant to prove the defense. *Bodenstab v. County of Cook*, 569 F.3d 651, 659 (7th Cir. 2009). It is true that the direct threat defense is certainly applicable in the disparate impact context to argue that a qualification standard of "not posing a direct threat" has a disparate impact on disabled individuals, especially when a consequence of their disability is to actually pose a direct threat. However, the Court sees no reason not to apply it as well in the disparate treatment context where an employment decision is intentionally based on the employer's assessment that an individual is a direct threat because it believes that threat to be a legitimate, nondiscriminatory reason for taking the employment action.[7]

    1.   <u>Claimants</u>

The EEOC argues that it is entitled to summary judgment on Amsted's direct threat defense as to the Claimants with abnormal NCT results because the undisputed evidence shows Dr. Dirkers did not conduct any individualized assessment of an applicant's ability to perform the chipper job before it placed him on medical hold or imposed restrictions inconsistent with the

---

[7] Even if the Court is wrong in considering the direct threat defense as an affirmative defense rather than in connection with the qualification question, it does not matter in the end. The Court of Appeals for the Seventh Circuit places the burden of proving that an applicant or employee poses a direct threat on the defendant in both circumstances. *See Bodenstab*, 569 F.3d at 658 (noting employer has burden of proving a direct threat). Thus, this discussion is essentially an extension of the qualification discussion.

chipper job.   Instead, he relied on his subjective belief that an abnormal NCT test indicated the applicant probably had CTS and would pose a danger to himself in the workplace.   He declined to make any further inquiry into whether a claimant was experiencing symptoms or perform other medical tests that would indicate a significant threat to himself in the future, and ignored medical evidence from other doctors indicating some Claimants were able to be chippers safely.   It believes that in 2011, when Dr. Dirkers formed these medical judgments, the most current medical knowledge was that an abnormal NCT result was not a symptom of CTS, that an NCT was a poor predictor of future CTS (less than 20% of those with abnormal tests developed CTS), that the vast majority of people with abnormal NCT results did not develop CTS, and that an NCT was an ineffective method of screening for CTS because it was overinclusive.   Considering the relevant factors, the EEOC argues that the risk of CTS reflected by an abnormal NCT result is insignificant, speculative, remote and unlikely, and that CTS is not life threatening and is readily treatable.

In response, Amsted argues that Midwest conducted individual examinations of each applicant and, based on its experience treating Amsted employees with CTS for decades, was aware that the nature of the chipper duties and the abnormal NCT result were risk factors for CTS. It argues that the risk of harm is of great duration because it exists as long as a worker is exposed to risk factors inherent in the chipper duties.   It also argues the risk of harm was severe because it could require surgery and moving from the chipper job.   It also notes that someone with an abnormal NCT result is generally three to four times more likely to develop CTS than someone with a normal NCT result and, in hand-intensive jobs like a chipper, is up to twenty times more likely.

No reasonable jury could find Dr. Dirkers conducted an individualized assessment of each claimant's ability to perform the job of chipper safely and came to a reasonable conclusion based

on the best available medical evidence, the abnormal NCT result.   It is true he performed individualized examinations, but it is equally clear he based his medical holds and restrictions on one single test – the NCT – even though those judgments were not reasonably justified by that test result.   An actual individualized assessment of whether an applicant could perform the chipper job safely in light of his abnormal NCT result would have included testing to determine whether the applicant actually had a condition such as CTS based on methods generally accepted by the medical community (that is, not a NCT alone), and an assessment of whether that condition was likely to develop further to injure the applicant.   *See, e.g., EEOC v. Am. Tool & Mold, Inc.*, 21 F. Supp. 3d 1268, 1286 (M.D. Fla. 2014).   Dr. Dirkers did not do this.   Instead, he relied solely on the statistic, which the EEOC's expert does not dispute, that those with abnormal NCT results are three to four times more likely to develop CTS than someone with a normal NCT result.   But three to four times a small risk is still small, not the type of significant risk the direct threat defense contemplates.   All sides agree that the NCT is a poor predictor of CTS, that is, the majority of people who have an abnormal NCT result will not develop CTS ("false positives," in statistical lingo).   The flip side is that a substantial number of people who test normal will still develop CTS ("false negatives").   Finally, CTS is not life-threatening, is a progressive condition unlikely to sneak up on anyone, and is treatable, although it may motivate an employee to change jobs at least temporarily to avoid CTS risks.

In light of these factors, no reasonable jury could find Amsted was reasonable in relying on Dr. Dirkers' medical judgment that a claimant otherwise acceptable to Amsted posed a *significant* risk, or had a high probability, of causing *substantial* harm, just because of an abnormal NCT result.   Instead, the factors lead to the unavoidable conclusion that the risk was relatively speculative and remote, and certainly not of the magnitude or likelihood to justify refusing to hire

a claimant based simply on an abnormal NCT result.   For these reasons, the EEOC is entitled to summary judgment on this issue.

2.      Ingram

As for Ingram, the EEOC argues Dr. Dirkers ignored the examination he actually conducted and found him a direct threat solely based on his prior CTS surgery.   He relied on a 1994 study by Suzanne Strasberg, M.D., that the EEOC contends was outdated and could not be applied to Ingram's situation because his profile did not match those of the study participants, his surgery was completely successful, and he was asymptomatic.     It believes that in 2011, when Dr. Dirkers formed this medical judgment, the most current medical knowledge did not justify finding Ingram was a direct threat.

Amsted argues that Dr. Dirkers' judgment that he posed a direct threat because of his prior CTS surgery was reasonable and was based on his experience with chippers and CTS at Amsted, his experience with secondary CTS surgery in other industries rendering workers disabled, and medical literature.   Dr. Dirkers reasoned that if Ingram would be hired as a chipper, because he had developed CTS in an earlier job that was not as taxing as the chipper job, he would get CTS again.   Based on at least one study, Dr. Dirkers believed Ingram was likely to be permanently disabled if he had repeat CTS surgery.

The Court believes no reasonable jury could find Dr. Dirkers' judgment as to Ingram was based on an individualized assessment or relied on the most current medical knowledge.   It is true that the 1994 study arguably provided some scientific support for his opinion that there was a high likelihood of a bad outcome after repeat CTS surgery for some individuals.   However, his opinion that Ingram would redevelop CTS was based on his assumptions that, because Ingram had developed CTS before and had surgery, he was especially susceptible to developing it again as a

chipper and would someday, in the future, develop it again if he became a chipper.   This

conclusion he reached without regard to his actual examination of Ingram, including his normal

NCT result and lack of any CTS symptoms.   Amsted has not pointed to any scientific support,

existing at the time of Dr. Dirkers' judgment, for the reasonableness of this assumption other than

the unexceptional proposition that the chipper job requires tasks that are CTS risk factors.   The

only reasonable conclusion is that Dr. Dirkers' judgment about Ingram was not a reasonable

medical judgment and was instead based on his own subjective views rather than scientific

support.   Because no reasonable jury could find Amsted complied with the ADA by relying on

Dr. Dirkers' unsupported medical judgment, the EEOC is entitled to summary judgment on this

issue.

IV.    **Conclusion**

For the foregoing reasons, the Court:

- **DENIES as moot** Amsted's motion to strike parts of Ingram's declaration in support of summary judgment (Doc. 108);

- **GRANTS in part** and **DENIES in part** the EEOC's motion for partial summary judgment on the issues of liability and the direct threat affirmative defense (Doc. 97).   The motion is denied to the extent it relies on the claims by claimants Cashen and Welch.   The motion is granted in all other respects;

- **GRANTS in part** and **DENIES in part** Amsted's motion for summary judgment (Doc. 98).   The motion is granted to the extent it seeks summary judgment on the EEOC's ADA claims for failure to accommodate and retaliation and on the EEOC's ADA claims for disparate treatment of claimants Cashen and Welch.   The motion is denied in all other respects;

- **ORDERS** that a telephone status conference be held on December 11, 2017, at 9:30 a.m. to discuss the future progression of this case; and

- **DIRECTS** the Court to enter judgment accordingly at the close of the case.

As a final note, the EEOC's filings are submitted in what appears to be 10-point font.

Such small print is exceedingly difficult for the Court's eyes, especially when the briefs are

voluminous.   The Court **ORDERS** that all future filings in this case must be in Times New

Roman font of at least 12-point size.

**IT IS SO ORDERED.**
**DATED:   November 16, 2017**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**
